UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

99 WALL DEVELOPMENT INC.,

                                 Plaintiff,

                -against-

ALLIED WORLD SPECIALTY INSURANCE COMPANY
formerly known as DARWIN NATIONAL ASSURANCE
COMPANY,

                                 Defendant.

-----------------------------------------------------------------

**OPINION AND ORDER ON DEFENDANT'S MOTION TO COMPEL**

**18-CV-126 (RA) (KHP)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/26/2020

**KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

      Defendant Allied World Specialty Insurance Company f/k/a Darwin National Assurance Company ("Allied World") has moved to compel production of certain documents that Plaintiff 99 Wall Development Inc. ("99 Wall") has withheld on grounds of privilege.  *See* Letter Motion, ECF No. 167.

## BACKGROUND

      99 Wall brought this case contending that it is entitled to certain insurance benefits in connection with losses sustained from two major water incidents that damaged a 29-story office building that 99 Wall converted into residential condominiums.  These events occurred on July 29, 2016 and October 6, 2016.  The Court assumes familiarity with the background facts and does not repeat them except as relevant to this instant dispute.  *See* ECF Nos. 101, 134.

      In late July 2016, 99 Wall hired several consultants to assist it in submitting its insurance claims to Allied World related to the water events.  The consultants included John Panico, a Public Adjuster from Affiliated Adjustment Group, Thomas Heck, a forensic accountant from

KPMG, Don Pierro, a construction/physical damage consultant from Casella Construction Corporation, and James Beach, a delay consultant from James R. Beach Consulting.  99 Wall represents that it began to routinely consult with its lawyers after the second water event to minimize its losses and "prepare its claims for litigation."  *See* Response, ECF No. 187 at 3.

99 Wall submitted its claims for insurance in connection with both water events.  The adjustment process lasted from in or about late 2016 through late 2017.  Throughout the insurance claims adjustment process, Allied World worked with 99 Wall and its consultants to identify 99 Wall's covered costs, resulting in payment of nearly $3 million in insurance benefits, which covered certain aspects of 99 Wall's claims.  Then, on March 16, 2017, the parties met to discuss resolution of the remainder of 99 Wall's claim for benefits.  In connection with that meeting, the parties entered into a "White Waiver" Agreement pursuant to which they agreed to waive any right to offer into evidence or to use in any manner in any dispute between them the fact of or substance of any discussions between the parties held on that day regarding 99 Wall's claim and the extent of coverage afforded by Allied World.  The White Waiver Agreement also provided that any and all written materials, documents, spreadsheets, work papers, presentations, or other data in any form prepared specifically for the March 16, 2017 discussion and not previously provided during the adjustment process would not be subject to discovery in any litigation of any kind.  The parties did not reach an agreement as to the remaining claims at the meeting.  As a follow-up to the meeting, on March 27, 2016, 99 Wall sent a letter to Allied World setting out 99 Wall's position as to its entitlement to certain insurance benefits.

In response to 99 Wall's letter, on April 3, 2017, Allied World indicated that it needed additional information to fully assess the amount of time that 99 Wall claims the project was delayed by the water incident. Allied World followed up in May 2017 indicating that it was seeking an appraisal of the remaining claims. According to Allied World, 99 Wall did not provide the information needed to support payment of further benefits, resulting in 99 Wall filing this action on January 8, 2018.

99 Wall claims that Allied World engaged in bad faith conduct during the adjustment period (*i.e.*, between the end of 2016 through the end of 2017) and breached its insurance contract.

Discovery has been contentious, and this Court has issued several decisions to resolve disputes, including with respect to privilege. The instant dispute arose after non-parties KPMG (99 Wall's accountant) and James Beach (99 Wall's delay consultant) produced documents pursuant to subpoenas issued by Allied World. The productions included communications between and among 99 Wall principals and consultants discussing the adjustment of 99 Wall's insurance claims during the adjustment process. After reviewing 99 Wall's privilege log, Allied World discovered that some of the KPMG and Beach documents were improperly listed on the privilege log, while others were left off the log entirely and not otherwise produced. These initially unproduced or withheld documents contained statements relevant to the insurance coverage claim, such as statements about 99 Wall's contractor being behind schedule and about project schedules not being updated or issued that are relevant to insurance coverage.

The parties met and conferred about Allied World's concerns that relevant documents had not been produced or had been improperly withheld as privileged. 99 Wall re-reviewed its

documents and produced fourteen additional documents.  *See* Letter Motion, ECF No. 167 at 3.  However, Allied World contends that 99 Wall has been overzealous in its privilege designations and continues to withhold relevant, non-privileged documents.  *See id.*  For example, it has identified documents that have no attorney listed as participating in the communication but were withheld on the basis of attorney-client privilege or attorney work product, documents containing communications where an attorney was "cc'd" but which lack any indication that the communication involved the request for or provision of legal advice, and documents that include communications to outside consultants who were assisting with claims adjustment, not litigation.  It also identified documents dated after the water incidents and prior to the White Waiver Agreement that appeared to be non-protected documents and communications about the adjustment process generally.

99 Wall states that the majority of Allied World's concerns pertain to documents that contain claim and case analysis and strategy from 99 Wall's agents, who were hired to help prepare 99 Wall's insurance claim for this litigation.  99 Wall contends that under Federal Rule of Civil Procedure 26(b)(3)(A), documents prepared by a party's representatives, consultants, suretors, and agents in anticipation of litigation may be protected under the work product doctrine.  It further explains that the communications and documents in question would not have been necessary had there not been an anticipation of litigation and that it became apparent at the time of the second water event that litigation with Allied World was likely.  99 Wall states that its consultants worked closely with its attorneys to provide them with information needed to shape its claim against Allied World while the adjustment process was

ongoing. It argues that its pursuit of an amicable resolution while simultaneously preparing for litigation does not preclude privilege or work product protection.

After meeting with the parties, this Court directed Allied World to identify a sample of twenty-five documents on 99 Wall's log for *in camera* review. *See* Order, ECF No. 179.

## LEGAL STANDARD

### I. Attorney-Client Privilege

In diversity cases such as this, where state law governs the claims, the Court looks to state law for determining privilege. *See e.g.*, *AIU Ins. Co. v. TIG Ins. Co.*, No. 07-cv-7052 (SHS) (HBP), 2008 WL 4067437, at *5 (S.D.N.Y. Aug. 28, 2008) (citations omitted) (applying New York law), *modified on reconsideration,* No. 07-cv-7052 (SHS) (HBP), 2009 WL 1953039, at *3 (S.D.N.Y. July 8, 2009) (continuing to apply New York law); *see also* Fed. R. Evid. 501. The parties agree that New York law governs.

"The elements of the attorney-client privilege under New York law are the existence of an attorney-client relationship, a communication made within the context of that relationship for the purpose of obtaining legal advice, and the intended and actual confidentiality of that communication." *Bowne of New York City, Inc. v. AmBase Corp.*, 161 F.R.D. 258, 264 (S.D.N.Y. 1995) (citing *People v. Osorio,* 75 N.Y.2d 80, 82-84 (1989)). Although the privilege was designed to promote full and frank communications between a client and counsel, and "thereby promote broader public interests in the observance of law and administration of justice," it is narrowly construed because the application of the privilege renders protected relevant information undiscoverable. *See Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *Hoopes v. Carota*, 531 N.Y.S.2d 407, 409 (3d Dep't 1988) (explaining that the attorney-client privilege "constitutes

5

an obstacle to the truth-finding process" and, thus, its "invocation should be cautiously observed to ensure that its application is consistent with its purpose" (internal quotation marks, alterations, and citations omitted)), *aff'd,* 74 N.Y.2d 716 (1989).

A party cannot insulate its communications and documents from discovery in a later litigation simply by copying an attorney. To be protected, the communication has to pertain primarily to the request for or provision of legal advice. *See Assured Guar. Mun. Corp. v. UBS Real Estate Sec. Inc.*, No. 12-cv-1579 (HB) (JCF), 2013 WL 1195545, at *9 (S.D.N.Y. March 25, 2013) (distinguishing communications involving legal matters from business matters); *U.S. Postal Serv. v. Phelps Dodge Refining Corp.,* 852 F. Supp. 156, 163-64 (E.D.N.Y. 1994). The privilege does not protect communications primarily serving a business function. *See Varughese v. Mount Sinai Med. Ctr.*, No. 13-cv-8812 (CM) (JCF), 2014 WL 349698, at *2 (S.D.N.Y. Jan. 31, 2014); *see also AIU Ins. Co.*, 2008 WL 4067437, at *11 (communications directed by in-house counsel containing "business-related or technical communications," and communications from in-house counsel "in his capacity as Vice President [] giving business advice," did not provide legal advice and were therefore not privileged); *Spectrum Sys. Int'l Corp. v. Chemical Bank*, 78 N.Y.2d 371, 379 (1991) ("[A] lawyer's communication is not cloaked with privilege when the lawyer is hired for business or personal advice, or to do the work of a nonlawyer . . . . The critical inquiry is whether, viewing the lawyer's communication in its full content and context, it was made in order to render legal advice or services to the client."). In this regard, courts have recognized that communications between non-attorney consultants and either the client or the client's attorney(s), made for the primary purpose of preparing and submitting insurance claims, may not be within the attorney-client privilege "even where the

communications from the third-party consultant 'significantly assisted the attorney in giving his client legal advice' and were 'important to the attorney's ability to represent the client.'" *See NYAHSA Servs., Inc. Self Ins. Tr. v. People Care Inc.*, No. 4697-10, 2016 WL 8291966, at *4 (N.Y. Sup. Ct. Dec. 27, 2016) (quoting *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999)); *see also Varughese*, 2014 WL 349698, at *2 ("[I]t is important to distinguish between communications serving primarily a business function, which are not protected, and communications made for the purpose of seeking legal advice." (citations omitted)).

The party asserting the privilege bears the burden of showing that it applies. *See, e.g., United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) (citing *von Bulow ex rel. Auersperg v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987)) (noting the burden and holding privilege to be waived where inmate conveyed privileged information to his sister over a phone line he knew was being recorded); *Priest v. Hennessy*, 51 N.Y.2d 62, 69 (1980) (noting the burden and holding attorney-client privilege did not apply where existence of attorney-client relationship was not shown); *Hoopes*, 531 N.Y.S.2d at 409-10 (noting to the burden and holding an exception to privilege applied where "defendant failed to advance a basis upon which the attorney-client privilege should appropriately be extended to the information sought").

In addition to bearing the burden of establishing privilege, the party asserting privilege bears the burden of showing that privilege was not waived. *See Pearlstein v. BlackBerry Ltd.*, No. 13-cv-07060 (CM) (KHP), 2019 WL 1259382, at *6 (S.D.N.Y. Mar. 19, 2019); *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 428 (S.D.N.Y. 2013) (citing *John Blair Commc'ns, Inc. v. Reliance Capital Grp.*, 582 N.Y.S.2d 720 (1st Dep't 1992)). There are various types of waivers. In this case, the only one mentioned in the motion papers is waiver by disclosure to a person outside

of the attorney-client relationship.  Under New York law, "[d]isclosure of a privileged document generally operates as a waiver of the privilege unless it is shown that the client intended to maintain the confidentiality of the document, [and] that reasonable steps were taken to prevent disclosure . . . ."  *New York Times Newspaper Div. of New York Times Co. v. Lehrer McGovern Bovis, Inc.*, 752 N.Y.S.2d 642, 645-46 (1st Dep't 2002) (citations omitted); *see also Osorio*, 75 N.Y.2d at 84.  However, if the third party outside of the attorney-client relationship is an agent of the attorney or client, then the disclosure may not result in a waiver.  *See Netherby Ltd. v. G.V. Trademark Investments, Ltd.*, 689 N.Y.S.2d 488, 489 (1st Dep't 1999) (citing *Le Long v. Siebrecht*, 187 N.Y.S. 150, 151 (2nd Dep't 1921)).

New York courts have developed a two-prong test to determine whether disclosure by a party to a purported agent of the party results in waiver of the attorney-client privilege.  Although no formal agency agreement is required, the party asserting privilege must demonstrate that when it disclosed the privileged communication to the purported agent:  (1) it had a "'reasonable expectation of confidentiality under the circumstances,'" and (2) the disclosure "was necessary for the client to obtain informed legal advice."  *Ross v. UKI Ltd.*, No. 02-cv-9297 (WHP) (JCF), 2004 WL 67221, at *3 (S.D.N.Y. Jan. 15, 2004) (quoting *Osorio,* 75 N.Y.2d at 84 & quoting *Nat'l Educ. Training Grp., Inc. v. Skillsoft Corp.*, No. M8–85, 1999 WL 378337, at *3 (S.D.N.Y. June 10, 1999)).  To meet the second prong of the test, the party asserting privilege must demonstrate "that the involvement of the third party [was] nearly indispensable or serve[d] some specialized purpose in facilitating the attorney-client communications."  *Id*. (internal quotation marks and citation omitted).  Likewise, a company's attorney may hire an outside consultant if needed to assist the attorney in rendering legal

advice.  Communications between the attorney and the consultant in this circumstance also will be protected by the attorney-client privilege and/or work product doctrine (discussed below). *See, e.g.*, *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 941 N.Y.S.2d 56, 58 (1st Dep't 2012) (communications prepared by consultants hired by plaintiff's counsel were protected by attorney-client and work product privilege because the communications were explicitly and contractually prepared in anticipation of litigation and advised plaintiff of the potential claims it could raise against defendant).

## II. *Work Product Doctrine*

Rule 26(b)(3) of the Federal Rules of Civil Procedure also provides protection to certain documents and communications prepared in anticipation of litigation.  The rule provides that "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."  Fed. R. Civ. P. 26(b)(3)(A); *see also Hickman v. Taylor*, 329 U.S. 495 (1947) (establishing and articulating application of the work product doctrine); *Welland v. Trainer,* No. 00-cv-0738 (JSM), 2001 WL 1154666, at *2 (S.D.N.Y. Oct. 1, 2001) (if a document "is created because of the prospect of litigation, analyzing the likely outcome of that litigation" it is eligible for work product protection (quoting *United States v. Adlman,* 134 F.3d 1194, 1202 (2d Cir. 1998)).

The key factor in determining applicability of this doctrine is whether the documents or things were prepared "with an eye toward" or "in anticipation of" or "because of the prospect of litigation."  *Adlman*, 134 F.3d at 1196 (quoting *Hickman*, 329 U.S. at 510-511), 1202 (citing Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, 8 Fed. Prac. & Proc. Civ. § 2024 (3d

9

ed. 1994). "[T]he doctrine is not satisfied merely by a showing that the material was prepared at the behest of a lawyer or was provided to a lawyer. Rather the materials must result from the conduct of investigative or analytical tasks to aid counsel in preparing for litigation." *Wultz v. Bank of China Ltd.,* 304 F.R.D. 384, 393-94 (S.D.N.Y. 2015) (internal quotation marks and citation omitted). Thus, a court must determine if the materials would have been prepared in essentially similar form irrespective of the litigation. *See Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. 96, 106 (S.D.N.Y. 2007) (quoting *Adlman*, 134 F.3d at 1204). But, unlike the rule for invoking attorney-client privilege, the predominant purpose of the work product need not be to assist with litigation to be protected; rather, the work product need only have been prepared or obtained because of the prospect of litigation. *See Adlman*, 134 F.3d at 1202; *Wultz*, 304 F.R.D. at 393-94. At the same time, the mere prospect of litigation does not confer work product status on documents that are otherwise created for normal business purposes. *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 74 (S.D.N.Y. 2010).

Work product comes in two forms. Opinion work product consists of the mental impressions, conclusions, opinions, and legal theories of an attorney or other representative of a party, and is given heightened protection. Fact work product consists of factual material, including the results of a factual investigation. This latter type of work product is subject to disclosure "upon a showing of substantial need and inability to obtain the equivalent without undue hardship." *Upjohn,* 449 U.S. at 400; *see also Hickman*, 329 U.S. at 511-12; *Adlman*, 134 F.3d at 1204.

Courts in the Second Circuit have held that "[a] substantial need exists 'where the information sought is "essential" to the party's defense, is "crucial" to the determination of

whether the defendant could be held liable for the acts alleged, or carries great probative value on contested issues.'" *Gucci Am.*, 271 F.R.D. at 74-75 (quoting *Nat'l Cong. for Puerto Rican Rights v. City of New York*, 194 F.R.D. 105, 110 (S.D.N.Y. 2000)). The documents must "have a unique value apart from those already in the movant's possession." *FTC v. Boehringer Ingelheim Pharm., Inc.*, 778 F.3d 142, 155-56 (D.C. Cir. 2015). Disclosure is warranted only when the moving party makes a strong showing of the relevance and importance of the fact work product and that "it is likely to be significantly more difficult, time-consuming or expensive to obtain the information from another source." *In re Aggrenox Antitrust Litig.*, No. 14-md-2516 (SRU), 2017 WL 5885664, at *15 (D. Conn. Nov. 29, 2017) (internal citations omitted).

## DISCUSSION

Allied World identified twenty-five documents on 99 Wall's privilege log as a sample for the Court's review. Initially, 99 Wall asserted attorney-client privilege over fifteen of the twenty-five sample documents and work product protection over twenty-three of the twenty-five sample documents. 99 Wall also claimed that one of the sample documents was protected by the parties' White Waiver Agreement. In the briefing, 99 Wall withdrew its objections to producing three of the twenty-five documents, leaving twenty-two for the Court to review *in camera*. 99 Wall also withdrew its contention that one of the documents is protected by the White Waiver Agreement, but still maintains the document is protected work product.

There are three documents dated January 4, 2017 or earlier, from the period when 99 Wall was collecting information and submitting its claims for insurance (the "claim period") for which

99 Wall maintains designations. 99 Wall asserts work product protection over two of the documents and both work product and attorney-client privilege protection over one.

One of the documents, dated March 13, 2017, 99 Wall maintains is protected work product.

Thirteen of the documents 99 Wall maintains designations for are emails dated from the period March 16, 2017 through March 27, 2017—the period immediately following the settlement meeting on March 16, 2017 and prior to sending the follow-up letter to Allied World on March 27, 2017 (the "claim settlement period"). 99 Wall asserts both attorney-client and work product protection over eight of these documents, work product and White Waiver Agreement protection over one document, and only work product as to four of the documents.

The remaining five documents were created after Allied World sent its April 3, 2017 letter seeking additional information and/or an independent adjuster for the claims (the "post adjustment letter period"). 99 Wall claims that two of these documents are protected by the attorney-client privilege and three are protected by both the attorney-client privilege and work product doctrine.

Most of the documents that 99 Wall has marked as attorney-client privilege in fact are not protected by the privilege for the simple reason that they do not seek or convey legal advice. These include 99Wall_Privilege0574, 0576, 0870, 0893, 0900, 0904, 0956, 1976, and the email chain dated May 17, 2017. Although in some cases an attorney is included in the communication, the communication pertains to scheduling or non-legal matters and therefore is not protected. 99 Wall clearly has been overzealous in its designations as to this privilege or misunderstands the limited scope of the privilege. The email chain numbered 99Wall_Privilege0888 reflects communications with counsel about a draft of the March 27,

2017 letter which was ultimately sent to Allied World.  This document was appropriately designated as privileged.[1]  The email chain numbered 99Wall_Privilege1932 reflects client notes on the April 3, 2017 Allied World letter that were prepared for counsel to obtain legal advice on the claim and are privileged.  The email chain dated April 28, 2017 between and among J. Picone, J. Panico, and T. Heck likewise reflects legal advice sought and conveyed and is therefore privileged.

    Lastly, two documents are partly privileged.  The top five emails in the chain of 99Wall_Privilege0936 and the top three emails in the chain of 99 Wall_Privilege0991, both dated March 21, 2017, contain a request for and conveyance of legal advice and are privileged.  These two documents also contain an email from T. Heck to J. Picone dated March 20, 2017 at 7:37 p.m. which discusses potential litigation and appears to have initiated the email chain with counsel.  The first paragraph of this email can be redacted as privileged and work product as it appears to have prompted the emails with counsel that followed and reflects a communication that was clearly in anticipation of litigation.  The remainder of the Heck/Picone email and the remaining emails in the chain are not privileged because they do not convey or request legal advice and are not work product as they are merely collecting support for 99 Wall's insurance claims in response to questions that came up at the March 16, 2017 meeting and appear not to have been made because of anticipated litigation, but rather to support 99 Wall's insurance claim.  While 99 Wall may have feared litigation as a possibility, Allied World had not denied the

---

[1] However, the document is not protected in its entirety as the initial email of the chain is neither within the attorney-client privilege nor protected by the word product doctrine.

claim for benefits or requested the independent adjuster at that point, and 99 Wall was answering questions in pursuit of its claim *to* its insurer.

In insurance matters, it is often difficult to determine when work product protection might apply. This is because it is routine for insurance companies to investigate claims while at the same time the potential for litigation is ever present. *See The American Insurance Co. v. Elgot Sales Corp.*, No. 97-cv-1327 (RLC), 1998 WL 647206, at *1 (S.D.N.Y. Sept. 21, 1998). Most of the cases involving insurance matters involve an insured seeking documents from an insurer. Generally, courts in this District have found that documents created by the insurer after it has declined coverage are presumed, or at least more likely, to have been created in anticipation of litigation and to be work product, whereas documents that are part of the claim investigation process are not typically work product. *See Great American Ins. Co. of New York v. Castleton Commodities Int'l LLC,* 15 Civ. 3976, 2015 WL 6437397, *2 (S.D.N.Y. Oct. 15, 2015) (citing *Stephenson Equity Co. v. Credit Bancorp., Ltd.*, No. 99-cv-11395 (RWS), 2002 WL 59418, at *3 (S.D.N.Y. Jan. 16, 2002). However, a case-by-case assessment of the facts is necessary to make the determination. *See Adlman*, 134 F.3d at 1202 (work product protection must be evaluated "'in light of the nature of the document and factual situation in the particular case" (quoting Wright, Miller, & Marcus, § 2024)).

In *Great American Ins. Co. of New York*, the Court held that the insured could not assert work product protection for documents created before their submission of proof of loss. *See* 2015 WL 6437397, at *4. It made the distinction between making a case *to* the insurers and a case *against* the insurers in court as the dividing line for when documents could properly be

deemed work product and not documents created in the ordinary course of submitting a claim. *Id.*

The chronology of events alone is not determinative in ascertaining whether documents were prepared in anticipation of litigation. The party asserting work product protection bears the "burden of demonstrating that the documents would not have been prepared but for the litigation." *Grinnell Corp. v. ITT Corp.*, 222 F.R.D. 74, 78 (S.D.N.Y. 2003) (quoting *Weber v. Paduano*, No. 02-cv-3392 (GEL), 2003 WL 161340, at *7 (S.D.N.Y. Jan. 22, 2003)) (finding documents regarding insurer's position on indemnification and analysis of agreement were work product because they supported inference that insurer anticipated it might challenge its obligation to indemnify insured and thus could fairly be said to have been created because of the prospect of litigation).

Keeping the above in mind, most of the documents that 99 Wall has designated as work product are not in fact work product. The three documents dated from January 4, 2017 or earlier are not work product. 99 Wall has produced no facts to support its argument that these documents were created in anticipation of litigation. Rather, they appear to have been created in the normal course of preparing a claim to the insurer. That 99 Wall already may have retained counsel does not confer work product protection to communications between and among non-lawyers and consultants hired to assist with submission of the insurance claim about costs to be submitted to support the insurance claim. Nothing in these emails reveals any litigation strategy or thoughts of an attorney. All are routine *business*, not legal, communications.

The email from March 13, 2017, is protected.  This communication was a planning communication for the settlement meeting on March 16, 2017 and falls within the protection of the White Waiver Agreement and can fairly be said to reveal strategy for discussing a settlement of the claim in lieu of litigation and is not merely collection of information pertinent to submission of the claim to Allied World so that it could determine coverage.

The documents dating from March 16, 2017 to March 27, 2017 require closer scrutiny, as these were generated after the March 16 settlement meeting at which no resolution of the claims was reached.  Based on the Court's review of these documents, it appears that 99 Wall gathered additional information in response to issues raised at the March 16, 2017 meeting to supply to Allied World in its March 27, 2017 letter.   The prospect of litigation was certainly greater at this time, but Allied World had not yet sent the letter requesting an adjuster and had not formally denied the claim.  99 Wall had engaged counsel at this time to review a draft of the March 27, 2017 letter, but the information gathered appears to have been in response to specific questions from Allied World and in pursuit of resolving the claim with Allied World—not against Allied World in litigation.  In addition to the portion of the two email chains noted above that contain work product, the following documents from the claim settlement period contain work product:  top two emails in email chain dated March 16, 2017 between J. Picone and C. O'Bryne, which discuss the prospect of litigation; top email and first paragraph of email dated from March 20, 2017 at 7:37 p.m. in document 99Wall_Privilege 2025; first paragraph of email dated from March 20, 2017 at 7:37 p.m. in document 99Wall_Privilege0991 and document 99Wall_Privilege0904.  The remainder of the email communications concern collection of information pertinent to the claim to the insurer, and 99 Wall has failed to present

16

facts demonstrating that these emails would have been prepared differently but for the prospect of litigation.  That is, although litigation might have been a possibility, 99 Wall was still making its claim to its insurer, and the communications all appear to be in pursuit of that business function.  Nothing in the communications reveals any legal strategy.

Finally, there are three documents in the sample that post-date March 27, 2017 that 99 Wall claims are protected by the work product doctrine.  The Court addresses them to the extent they are not protected by the attorney-client privilege.  Document 99Wall_Privilege1976 and its top seven emails—beginning with the email sent at 9:10 a.m., dated November 16, 2017—discuss Allied World's final settlement offer preceding the institution of this lawsuit.  These were created in anticipation for litigation, contain mental impressions constituting opinion work product, and clearly do not relate to the regular claims filing process.  The last document, 99Wall_Privilege0893 is not work product because it is merely a communication among non-lawyers conveying a draft of a letter that was sent to Allied World.  It does not reveal any legal strategy, and 99 Wall supplies no information to indicate why the communication was had in anticipation of litigation as opposed to simply being 99 Wall's final position as to its claim to Allied World in advance of the independent adjuster evaluating the claim.  Therefore, 99 Wall has failed to meet its burden of demonstrating why work product protection should attach.

## CONCLUSION

For the reasons set forth above, Allied World's motion is granted in part and denied in part. 99 Wall shall re-review its privilege log and produce documents in whole or in a redacted

17

format consistent with this decision.  The Court attaches a chart with its rulings as to specific documents in the sample.

    SO ORDERED.

Dated: May 26, 2020
       New York, New York

_____
KATHARINE H. PARKER
United States Magistrate Judge