UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

99 WALL DEVELOPMENT INC.,

                                            Plaintiff,

        -against-


ALLIED WORLD SPECIALTY INSURANCE
COMPANY f/k/a DARWIN NATIONAL
ASSURANCE COMPANY,

                                            Defendant.
------------------------------------------------------------------------X

Civil Action No.:
1:18-CV-00126 (RA)


**ALLIED WORLD'S
MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION
FOR PARTIAL SUMMARY
JUDGMENT REGARDING 99
WALL'S PLEAS FOR
CONSEQUENTIAL DAMAGES
AND ATTORNEYS' FEES**


**ZELLE LLP**

Matthew L. Gonzalez, Esq.
Isabella Stankowski-Booker, Esq.
Peter Kelly Golfman, Esq.
Jennifer Hoffman, Esq.
*Attorneys for Allied World Specialty
Insurance Company*
45 Broadway, Suite 920
New York, New York 10006
Tel.: (646) 876-4410

## TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................1

II.  FACTUAL BACKGROUND ..................................................................................2

    A.  Allied Worlds' Claims Investigation ...............................................................3

    B.  Allied World Promptly Paid Nearly 100% of 99 Wall's Repair Costs.............................4

    C.  99 Wall Acknowledges That Its Delay Claim Could Not Be Adjusted Until After
        Construction Was Complete ...........................................................................6

    D.  Review of Allied World's Claims Handling by Experts ...................................11

III. PROCEDURAL HISTORY MATERIAL TO THIS MOTION..............................12

IV.  ARGUMENT ......................................................................................................13

    A.  Summary Judgment Standard ........................................................................13

    B.  The Insured Must Satisfy a Heavy Burden to Prevail on a Claim for
        Consequential Damages.................................................................................14

        1.  Allied World Has a Legitimate Coverage Dispute and Did Not Breach the
            Covenant of Good Faith and Fair Dealing.................................................15

        2.  Allied World's Conduct Did Not Cause 99 Wall's Alleged Consequential
            Losses.........................................................................................18

    C.  99 Wall Cannot Sustain a Claim for Attorneys' Fees and Costs ......................21

V.   CONCLUSION....................................................................................................22

## **TABLE OF AUTHORITIES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) .......................................................... 14

*Ashland Mgt. v. Janien*, 624 N.E.2d 1007, 1011 (N.Y. 1993) ...................................................... 19

*Bi-Economy Market Inc v. Harleysville Ins*. Co. of New York, 886 N.E.2d 127 (2008) . 15, 19, 21

*Cohen v. Liberty Mut. Grp. Inc*., 380 F. Supp. 3d 363, 375 (S.D.N.Y. 2019) ............................. 14

*Ebrahimian v. Nationwide Mut. Fire Ins. Co*., 960 F. Supp. 2d 405, 417 (E.D.N.Y. 2013) ...................................................................................................................... 15, 19, 21

*Goldmark, Inc. v. Catlin Syndicate Ltd*., 2011 WL 743568, at *3 (E.D.N.Y. 2011) ................... 15

*Jane St. Holding, LLC v. Aspen Am. Ins. Co*., 2014 WL 28600, at *11 (S.D.N.Y. 2014), *aff'd*, 581 F. App'x 49 (2d Cir. 2014) .......................................................................... 15

*Kenford Co. v. County of Erie*, 493 N.E.2d 234 (N.Y. 1986) ....................................................... 19

*Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir. 2003) ................................... 22

*Panasia Estates, Inc. v. Hudson Ins, Co*., 886 N.E.2d 135 (2008) .............................................. 15

*Sikarevich Family L.P. v. Nationwide Mut. Ins. Co*., 30 F. Supp. 3d 166, 173 (E.D.N.Y. 2014) ....................................................................................................................... 15

*Stein LLC v. Lawyers Title Ins. Corp*., 100 A.D.3d 622, 623 (2d Dep't 2012) ............................ 22

*Sukup v. State of New York*, 19 N.Y.2d 519 (1967) ............................................................... 16, 22

*Sunrise One, LLC v. Harleysville Ins. Co. of New York*, 293 F. Supp. 3d 317, 328 (E.D.N.Y. 2018) .................................................................................................................. 15, 16

*Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co*., 238 F. Supp. 3d 314 (N.D.N.Y. 2017) . 15, 16, 17

*Wang v. Hearst Corp*., 877 F.3d 69, 76 (2d Cir. 2017) ................................................................ 14

*Westinghouse Credit Cor. V. D'Urso*, 278 F.3d 138, 145 (2d Cir. 2002) .................................... 14

*Woodworth v. Erie Ins. Co*., 2009 WL 1652258, at *1 (W.D.N.Y. 2009) ................................... 19

*Zarour v. Pac. Indem. Co*., 113 F. Supp. 3d 711 (S.D.N.Y. 2015) .............................................. 15

## I.   INTRODUCTION

This case involves an insurance coverage dispute between Plaintiff 99 Wall Development Inc. ("99 Wall"), the owner of a construction project located at 99 Wall Street in Manhattan, NY (the "Project"), and its builders' risk insurer, Defendant Allied World Specialty Insurance Company f/k/a Darwin National Assurance Company ("Allied World"), regarding two separate water losses. 99 Wall asserts that the two losses, collectively referred to as "the Water Events," caused physical damage and delayed the completion of the Project. As part of its breach of contract action, 99 Wall seeks consequential damages and attorneys' fees as a result of Allied World's alleged unfair claims handling. Specifically, 99 Wall alleges that Allied World breached the covenant of good faith and fair dealing by repeatedly requesting duplicative documents and inordinately delaying the adjustment in an attempt to force 99 Wall to settle its claims for lesser amounts than 99 Wall was entitled.

In 2018, Allied World moved to dismiss 99 Wall's claims for extra-contractual damages. This Court, however, determined that 99 Wall's allegations were "just sufficient enough" to avoid a motion to dismiss. Since that time, the Parties' have completed discovery. Allied World now seeks summary judgment as there is no evidence that Allied World breached the covenant of good faith and fair dealing. In fact, 99 Wall's own consultants have acknowledged that Allied World's investigation was reasonable.  Moreover, 99 Wall conceded that Allied World paid nearly all of its physical damage claim within four months of the second water loss. 99 Wall also acknowledges that this lawsuit only arose because of a disagreement related to its delay in startup claim. However, 99 Wall's delay expert opined that Allied World could not calculate or adjust the delay in start-up claim until <u>after</u> the impact of that delay on the Project was complete, which was not until after this litigation commenced. Perhaps the most significant revelation uncovered during

discovery is that 99 Wall schemed to "scare" Allied World into settling the litigation by alleging bad faith and threatening "millions in lost contracts."

Under New York law, a general disagreement between an insurer and an insured related to coverage and valuation is insufficient to sustain a claim for extra-contractual damages. Instead, 99 Wall must demonstrate that Allied World lacked an arguable basis for its actions and that no reasonable carrier would have denied coverage under the facts. Here, the undisputed evidence demonstrates that Allied World promptly and thoroughly investigated 99 Wall's claims and paid nearly all of 99 Wall's claimed repairs costs within a few months of the losses. With respect to the delay claim, the evidence demonstrates that Allied World had an arguable basis for its actions. 99 Wall's claims that Allied World breached the covenant of good faith and fair dealing constitute nothing more than a genuine dispute over coverage and valuation of 99 Wall's delay claim, as acknowledged by 99 Wall's own expert. Accordingly, 99 Wall cannot even come close to demonstrating a valid claim for extra-contractual damages and Allied World is entitled to summary judgment.

## II.   FACTUAL BACKGROUND

On July 29, 2016, rain water leaked through a roof penetration and damaged the Project's elevator controllers.[1] Separately, on October 6, 2016, a temporary water tank located on the 25th floor leaked and damaged the Project (collectively "the Water Events").[2]

Following the Water Events, 99 Wall submitted claims to Allied World under its builder's risk Policy (the "Policy"). 99 Wall's claims contained two components, one for physical damage and one for delay in start-up.[3] Both Parties retained consultants to adjust the losses.[4]

---

[1] Allied World's Rule 56.1 Statement at ¶3.
[2] Allied World's Rule 56.1 Statement at ¶3.
[3] Allied World's Rule 56.1 Statement at ¶4.
[4] Allied World's Rule 56.1 Statement at ¶5.

### A.     Allied Worlds' Claims Investigation

Upon receiving notice of each claim, Allied World promptly visited the Project to inspect the damage and begin collecting information.[5] In addition to site inspections, Allied World's consultants promptly began collecting loss-related documentation by issuing requests for information (RFI) to 99 Wall. Allied World's first RFI was sent on August 24, 2016, less than a month after the first loss.[6] This request sought documentation about the loss, the construction schedule, and requested documents in the possession of 99 Wall and its contractors.[7]

Allied World reviewed the limited documentation provided by 99 Wall, updated their RFIs accordingly, and periodically renewed and supplemented those requests.[8] Although 99 Wall has alleged that Allied World's RFIs were "unreasonable," 99 Wall's public adjuster testified to the contrary:

> Q.     During the course of the adjustment, were you provided with requests for information from the adjustment team?
>
> A.     Yes.
>
> Q.     Were they typical requests for information that you would expect for this type of claim?
>
>                                     * * *
>
> A.     Yes.
>
> Q.     Is it safe to say you've received -- on other builder's risk claims you've handled, you've received similar requests for information?
>
> A.     Yes.
>
> Q.     Did you think any of the requests for information that were provided by the adjustment team were unnecessary?

---

[5] Allied World's Rule 56.1 Statement at ¶6.
[6] Allied World's Rule 56.1 Statement at ¶¶7-9.
[7] Allied World's Rule 56.1 Statement at ¶8.
[8] Allied World's Rule 56.1 Statement at ¶¶7, 9.

A.      No.[9]

* * *

Q.      Okay. If you have a look at the information Mr. DePhillips [of JS Held] was requesting, are these the types of things you would normally see being requested by the carrier's adjustment team as part of their review of a delay in completion claim?

A.      Yes.

Q.      These are reasonable?

A.      These are outstanding requests that the carriers made that we have to cooperate with answering. Do I think it's reasonable? Yes.[10]

Based on the above testimony, 99 Wall's own public adjuster found that Allied World's requests for information were reasonable.[11] And, 99 Wall offered no evidence that Allied World's RFIs were duplicative or requested in an attempt to delay the adjustment. Moreover, when asked if there was "anything unusual about the adjustment of this claim, in [his] experience," Mr. Panico unequivocally stated "no."[12]

### B.      Allied World Promptly Paid Nearly 100% of 99 Wall's Repair Costs

99 Wall's physical damage claim for the two Water Events totaled approximately $2.5M.[13] Shortly after the Water Events, Allied World made a series of payments to 99 Wall totaling $2,396,006 for the cost to repair physical damage.[14]  Specifically, those payments are as follows:

|  |  |
|---|---|
| For the July 29, 2016 Water Event: | October 28, 2016 - $100,000 February 16, 2017 - $51,151 |
| For the October 6, 2016 Water Event: | October 28, 2016 - $500,000 November 21, 2016 - $500,000 December 23, 2016 - $863,705 |

---

[9] Allied World's Rule 56.1 Statement at ¶10; J. Panico Tr. at 38:3-25.
[10] Allied World's Rule 56.1 Statement at ¶10; J. Panico Tr. 159:24-160:7 (objections omitted).
[11] Allied World's Rule 56.1 Statement at ¶10.
[12] Allied World's Rule 56.1 Statement at ¶10; J. Panico Tr. at 37:23–38:2.
[13] Allied World's Rule 56.1 Statement at ¶14. 99 Wall's repair claim in this litigation is now $2,772,263. Allied World's Rule 56.1 Statement at ¶15.
[14] Allied World's Rule 56.1 Statement at ¶¶12-14.

February 16, 2017 - $381,149[15]

As the above demonstrates, Allied World paid 99 Wall nearly 100% of the claimed costs to repair the physical damage within four months of the October 6 loss.[16] In addition, on February 16, 2017, Allied World also made an additional $600,000 payment to 99 Wall on an unallocated basis.[17]

In fact, several 99 Wall representatives testified that 99 Wall was satisfied with Allied World's handling of the physical damage claim. For example, 99 Wall's Public Adjuster testified as follows:

> Q.     And I believe we discussed earlier that the repair costs submitted [by 99 Wall] for event two through February were approximately $2.5 million, that was the submission. Do you recall that?
>
> A.     Yes.[18]

***

> Q.     So if I understand this correctly, by February 15th, 2017, approximately four months after the loss, Allied World agreed to pay 99 Wall $2,269,851 for the second loss event; is that correct?
>
> A.     Yeah, less the deductible, 25,000, that's correct.
>
> Q.     Was that a reasonable time frame?
>
> A.     Yes.[19]

Likewise, 99 Wall's Principal, Mr. John Lari, testified as follows:

> Q.     . . . do you have an opinion one way or the other whether or not Allied World timely adjusted the repair costs claim, the physical damage repairs for the two events?
>
> MR. SAXE:    I object to the form.

---

[15] Allied World's Rule 56.1 Statement at ¶¶12-14.
[16] Allied World's Rule 56.1 Statement at ¶¶12-14.
[17] This payment is not included in the $2,396,006 amount. Allied World's Rule 56.1 Statement at ¶¶31-32.
[18] Allied World's Rule 56.1 Statement at ¶16; J. Panico Tr. 246:4-246:25.
[19] Allied World's Rule 56.1 Statement at ¶16; J. Panico Tr. at 146:8-16.

> A. If there was only a physical damage claim, we would not be litigating, so we were fine with the way Allied World handled the physical damage payments, not related to general conditions and the delay.[20]

Similarly, Mr. Justin Picone, 99 Wall's Chief Financial Officer, testified as follows:

> Q. When you say "[Allied World] has paid us for 99 percent of the direct hard costs claim," as you sit here today, what are you saying, or what did you mean?

> A. . . . what I'm saying is that for just those costs, the direct -- what I keep referring to as the direct damages we were paid – well . . . If you take the position that half -- half of that $600,000 unallocated amount, approximately -- I'm just taking that position, at least saying theoretically – if you were to say that half of that money was really intended for what was left outstanding on our direct hard costs claim, then at that point in time we were -- yeah, we were paid a hundred percent.[21]

Based on the foregoing testimony, it is undisputed that just four months after the occurrence of the second Water Event, Allied World had paid 99 Wall nearly 100%, of the undisputed adjusted amount of the insured's physical damage claim.[22] Moreover, Allied World's subsequent unallocated payment of $600,000, would have covered any outstanding amount due for repair costs.

### C. 99 Wall Acknowledges That Its Delay Claim Could Not Be Adjusted Until After Construction Was Complete

In addition to the physical damage repairs, 99 Wall also sought payment of millions of dollars in delay in start-up costs.[23] However, as explained by 99 Wall's own expert, the analysis of 99 Wall's delay claim could not be determined until after the impact of that delay was realized, which essentially requires the Project to be complete.[24] Specifically, 99 Wall's delay expert, James Beach, testified as follows:

---

[20] Allied World's Rule 56.1 Statement at ¶16; J. Lari Tr. at 98:19-99:19.
[21] Allied World's Rule 56.1 Statement at ¶16; J. Picone Tr. at 227:24-229:18.
[22] Allied World's Rule 56.1 Statement at ¶¶12-14.
[23] Allied World's Rule 56.1 Statement at ¶17.
[24] Allied World's Rule 56.1 Statement at ¶18.

> You can't -- you could not evaluate the impact of the repair work until they're completed. [Y]ou can't analyze or evaluate the extent of the delay until that delay is complete. . . But if [a delay report] was prepared in the middle of the remediation or repairs or corrective work of the second water event, I would not know at this time how long those repairs would take.[25]

99 Wall's own expert acknowledges that the Project was not completed until sometime in 2018, which was after litigation commenced.[26]

In addition, the Parties must review schedule-related documentation to identify what impact, if any, a covered loss had on the schedule.[27] In this litigation, the delay experts for both Parties relied heavily on the Project's daily reports, meeting minutes, and project-related emails prepared by the contractor (TGN).[28] These documents are crucial to the delay analysis in that they provide contemporaneous Project-related information, which allow the delay experts to reach conclusions regarding the accuracy (or inaccuracy) of the published Project schedules.[29] However, despite Allied World's request for these Project-specific records, 99 Wall failed to provide these documents to Allied World.[30]  In fact, it was not until discovery in this litigation that TGN (99 Wall's contractor) provided these documents to Allied World.[31]

Specifically, as Allied World's delay expert Lisa Enloe testified:

A.    At the beginning of 2018, we were still missing many daily reports and many meeting minutes, and we had a lot of schedules but not -- not the full contingent of schedules. So we were trying to put together the story, but since the daily reports and the meeting minutes ended, we had to wait until we got that data and compare that to whatever schedules we had, and we did get more schedules at that point. And finding out as we reviewed this that the schedules did not align with what was actually going on in the

---

[25] J. Beach Tr. at 248-249:2-9.

[26] Allied World's Rule 56.1 Statement at ¶19; J. Beach Tr. at 120:21, 259:25-260:3.

[27] Allied World's Rule 56.1 Statement at ¶¶22-25.

[28] Allied World's Rule 56.1 Statement at ¶¶22-25.

[29] Allied World's Rule 56.1 Statement at ¶¶22-25.

[30] Allied World's Rule 56.1 Statement at ¶¶26-27.

[31] In March 2019, TGN produced more than 117,000 responsive documents.  Allied World's Rule 56.1 Statement at ¶27.

> project was unusual, and when we finally received the Nickel production,
> again, it confirmed that the schedules were not correct.[32]

Thus, although the Project was not finished until well into 2018, and although 99 Wall did not produce thousands of pages of available documents related to project scheduling, 99 Wall demanded that Allied World pay millions of dollars for alleged loss-related delays as early as December 2016.

Although Allied World could not complete a delay analysis, Allied World agreed to engage in settlement negotiations.[33] In an effort to resolve the dispute, Allied World asked one of its consultants from JS Held, Mr. Doug DePhillips, to prepare an internal preliminary delay analysis based on the limited information available to him at that time.[34] As Paul Aviles, Allied World's claim's manager, testified during his deposition, Allied World instructed Mr. DePhillips "to go out and see if they could come up with a delay period so that we could negotiate in the meeting" and that Mr. DePhillips "came up with some -- some estimates of times. I don't know necessarily that they were considered delay under the terms of the policy."[35] Mr. Aviles confirmed that Mr. DePhillips' analysis in early 2017 "wasn't representative of what an actual delay to this overall project was,"[36] but rather "gave [Allied World] some scenarios in terms of days, but with the caveat that they were missing a bunch of information . . ."[37] Thus, based on the limited information available to him, Mr. DePhillips prepared a preliminary internal analysis, finding that the first Water Event did not delay the Project, and that the second Water Event caused a 105-day delay to

---

[32] Allied World's Rule 56.1 Statement at ¶¶26-27; L. Enloe Tr. at 67:2-16.
[33] Allied World's Rule 56.1 Statement at ¶28.
[34] Allied World's Rule 56.1 Statement at ¶28.
[35] Allied World's Rule 56.1 Statement at ¶29; P. Aviles Tr. at 15:9-17.
[36] Allied World's Rule 56.1 Statement at ¶29; P. Aviles Tr. at 183:10-12.
[37] Allied World's Rule 56.1 Statement at ¶29; P. Aviles Tr. at 25:5-10.

the completion of the Project.[38] In light of these estimates, Allied World paid 99 Wall an additional $600,000 on an unallocated basis in an effort to settle 99 Wall's delay claim.[39]

Notwithstanding this payment, settlement negotiations failed.[40]  Through discovery, Allied World learned that after a settlement meeting on March 16, 2017, 99 Wall was no longer interested in negotiating a settlement with Allied World and that 99 Wall had begun to prepare for litigation.[41] Specifically, on March 17, 2017, Alex Lari, 99 Wall's Principal, sent the following email to other members of 99 Wall:

> I would now do two things, strong letter from our lawyer, and keeping our moves away from Panico. Let's scare them. In our lawyer's letter we should throw in millions in lost contracts (6% interest cost to bank plus 10% drop in prices, plus carrying cost of units and taxes until resold all in one year).
>
> We should claim millions and threaten them with a lawsuit and tell them, they are negotiating in bad faith and copy our ins broker to forward to carrier.[42]

As starkly demonstrated by Mr. Lari's frank internal communication to other 99 Wall members, 99 Wall intended to "scare" Allied World, "claim millions," and "threaten them with a lawsuit and tell them, they are negotiating in bad faith."[43]

Ten days after the March 16, 2017 meeting, and prior to the Project's completion, 99 Wall updated its claim.[44] 99 Wall estimated its unpaid delay-related losses at over $8M and asserted that Allied World's failure to make these payments caused 99 Wall over $17M in consequential damages.[45]  At this time, however, the Project was still incomplete and 99 Wall had failed to provide Allied World with the necessary Project-related documentation.[46]

---

[38] Allied World's Rule 56.1 Statement at ¶30; D. DePhillips Tr. at 124:1-9.
[39] Allied World's Rule 56.1 Statement at ¶32.
[40] Allied World's Rule 56.1 Statement at ¶33.
[41] Allied World's Rule 56.1 Statement at ¶34.
[42] Allied World's Rule 56.1 Statement at ¶34.
[43] Allied World's Rule 56.1 Statement at ¶34.
[44] Allied World's Rule 56.1 Statement at ¶35.
[45] Allied World's Rule 56.1 Statement at ¶35.
[46] Allied World's Rule 56.1 Statement at ¶36.

Moreover, Allied World learned through discovery, that just prior to sending the March 27, 2017 letter, 99 Wall's Public Adjuster informed 99 Wall that "the amount [claimed in the letter] is so high and so different than anything previously submitted that settlement talks will end" but that 99 Wall "told him [they] are proceeding regardless."[47] 99 Wall also told its own Public Adjuster that "in 60 days [99 Wall's] loan is paid off and there will be zero pressure to settle [with Allied World] at that point.[48]

On April 3, 2017, Allied World responded to 99 Wall's March 27, 2017 letter, noting that there appeared to be an "impasse in reaching an agreement on several aspects of the claim" and explaining that Allied World "will require additional information in order to fully assess the amount of time that it is claimed the Project was delayed by the water damage incident."[49] Allied World specified that "[i]n order to complete its assessment of 99 Wall's delay in completion claim, [it] must be able to determine the 'delay period' as that term is defined by the Policy."[50] Lastly, Allied World suggested "that the most expedient way to resolve the substantial differences that continue to exist might be through an appraisal as provided for in the Policy."[51]

On April 27, 2017, 99 Wall responded with a second letter, reiterating its apparent irritation with Allied World, but failing to respond to Allied World's appraisal request.[52] On March 10, 2017, Allied World sent a final letter to 99 Wall, outlining the coverage and valuation differences between the Parties and again seeking an appraisal to resolve the outstanding issues.[53]

---

[47] Allied World's Rule 56.1 Statement at ¶37.
[48] Allied World's Rule 56.1 Statement at ¶37.
[49] Allied World's Rule 56.1 Statement at ¶38.
[50] Allied World's Rule 56.1 Statement at ¶38.
[51] Allied World's Rule 56.1 Statement at ¶38.
[52] Allied World's Rule 56.1 Statement at ¶39.
[53] Allied World's Rule 56.1 Statement at ¶40.

Unfortunately, 99 Wall never responded to Allied World's appraisal request. Instead, on January 8, 2018, 99 Wall sued Allied World.[54]

### D.    Review of Allied World's Claims Handling by Experts

The Parties exchanged expert reports related to 99 Wall's "bad faith" claim on November 27, 2019.[55] 99 Wall issued a Rule 26(a)(2) report by Mr. Colin Daigle of the Imperium Consulting Group. Mr. Daigle's report reviews 99 Wall's entire damages claim, including its claim for consequential damages.[56] Critically**,** however, Mr. Daigle's report offers **no** review or opinion as to whether Allied World violated its duty of good faith and fair dealing or that Allied World's conduct resulted in 99 Wall's alleged damages.[57] In fact, Mr. Daigle's report expressly states that he "offers no opinions regarding the merits, entitlement, or coverage application with regard to the delays, or basis for Bad Faith, that are the framework for ICG's calculations."[58] Moreover, during his deposition, Mr. Daigle confirmed same:

> Q.    Did you independently review whether Allied World's conduct in the adjustment of the loss amounted to bad faith?
>
> A.    No.
>
> Q.    Do you have an opinion one way or the other whether that did?
>
> MR. SAXE: Objection.
>
> A.    I do not.                                        ***
>
> Q.    Who's [sic] determination did you rely on with regard to bad faith?
>
> A.    I made no determination about bad faith.[59]

---

[54] Allied World's Rule 56.1 Statement at ¶40.
[55] Allied World's Rule 56.1 Statement at ¶41.
[56] Allied World's Rule 56.1 Statement at ¶42.
[57] Allied World's Rule 56.1 Statement at ¶42.
[58] Allied World's Rule 56.1 Statement at ¶42.
[59] Allied World's Rule 56.1 Statement at ¶42; C. Daigle Tr. at 155:1–156:12.

As a result, although Mr. Daigle's report contains a review of costs 99 Wall seeks in this litigation stemming from Allied World's alleged bad faith conduct, neither Mr. Daigle, nor any other expert for 99 Wall, opined on whether Allied World's conduct did, in fact, amount to a breach of the covenant of good faith and fair dealing.[60]  Nor did 99 Wall offer any testimony rebutting Mr. Evans' opinions.

## III.   PROCEDURAL HISTORY MATERIAL TO THIS MOTION

In its Amended Complaint, 99 Wall alleged that Allied World breached the covenant of good faith and fair dealing and asserted that it was entitled to consequential damages.[61] Specifically, 99 Wall alleged that Allied World: 1) "repeatedly required unreasonable and duplicate documents supporting the claims as part of its investigation," 2) "ignored information that 99 Wall timely and repeatedly produced for Allied World responsive to Allied World's barrage of constant requests for more information," 3) "inadequately investigated the claims related to the Water Losses," 4) "inordinately delayed the adjustment and review of the claims related to the Water Losses," 5) and "attempted to take advantage of 99 Wall's dire financial crisis related to the funding and completion of the Project in an attempt to force 99 Wall into settling its claims for pennies on the dollar." [62]

Allied World subsequently moved to dismiss that cause of action.[63] On January 28, 2019, this Court issued an oral ruling, denying Allied World's motion.[64] Specifically, the Court declined

---

[60] Allied World's Rule 56.1 Statement at ¶¶42-43.

[61] ECF No. 28.

[62] Per the Amended Complaint, 99 Wall seeks millions in costs related to condominium unit buyer concessions, cancellation of sales of condominium units, sales price depreciation on cancelled sales of condominium units, advertising and public relations costs, bank consultant costs, lender extensions, legal consultant costs, construction loan interest, real estate taxes, sales team expenses, insurance costs, and temporary office space expenses. ECF No. 28.

[63] Allied World also moved to dismiss 99 Wall's claims for common-law or statutory bad faith. The Court found that 99 Wall's pleadings set forth a single cause of action for breach of contract and explained that courts have permitted a bad faith allegation to be included in a complaint as part of a breach of contract cause of action. ECF No. 102 at 4-5.

[64] ECF No. 102.

to strike 99 Walls claim for consequential damages, finding that even though "it was a close question," 99 Wall's allegations related to unfair claims handling were "just sufficient enough to sustain a claim for consequential damages."[65]

Additionally, the Court deferred ruling on Allied World's request to dismiss 99 Wall's claim for attorneys' fees in the event 99 Wall could make out a claim under New York's narrow exception to the general rule prohibiting claims for attorneys' fees in the insurance context.[66] The Court likewise deferred ruling on Allied World's request to dismiss 99 Wall's claim for interest, finding that interest would be determined if 99 Wall eventually obtains a judgment.[67]

## IV.    ARGUMENT

### A.    Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ P. 56(c). Although the Court must construe the evidence in a light most favorable to the non-moving party and draw all inferences in favor of that party, *Westinghouse Credit Cor. V. D'Urso*, 278 F.3d 138, 145 (2d Cir. 2002), the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Wang v. Hearst Corp.*, 877 F.3d 69, 76 (2d Cir. 2017). A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Cohen v. Liberty Mut. Grp. Inc.*, 380 F. Supp. 3d 363, 375 (S.D.N.Y. 2019). Where the moving party

---

[65] ECF No. 102 at 6.
[66] ECF No. 102 at 8.
[67] ECF No. 102 at 9.

satisfies the initial burden of establishing that no genuine factual dispute exists, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," and to present such evidence that would allow a jury to find in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

> **B.**      **The Insured Must Satisfy a Heavy Burden to Prevail on a Claim for Consequential Damages**

99 Wall's claim for consequential damages should be dismissed as a matter of law because Plaintiff cannot make a *prima facia* showing that Allied World breached the covenant of good faith and fair dealing. As discussed below, the record is devoid of any evidence that Allied World breached its covenant. Rather, the factual evidence and expert testimony demonstrate that Allied World properly investigated and adjusted 99 Wall's claim.

Under New York law, an insured must establish the following two elements in order to recover consequential damages in the insurance context: (1) that its alleged damages flowed directly from its insurer's breach of the covenant of good faith and fair dealing; and (2) that such consequential damages were foreseeable and within the parties' contemplation at the time of contracting. *Bi-Economy Market Inc v. Harleysville Ins*. Co. of New York, 886 N.E.2d 127 (2008); *Panasia Estates, Inc. v. Hudson Ins, Co*., 886 N.E.2d 135 (2008); *Goldmark, Inc. v. Catlin Syndicate Ltd*., 2011 WL 743568, at *3 (E.D.N.Y. 2011) (explaining that courts in the Second Circuit have consistently held that proof of both elements are required to recover consequential damages); *Sikarevich Family L.P. v. Nationwide Mut. Ins. Co*., 30 F. Supp. 3d 166, 173 (E.D.N.Y. 2014) (same). Not surprisingly, the burden of proof on a party seeking to recover consequential damages is high and prevailing upon such claim is difficult. *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co*., 238 F. Supp. 3d 314 (N.D.N.Y. 2017).

Courts applying New York law have consistently dismissed consequential damages claims on summary judgment due to the insured's failure to establish a necessary element. *Jane St. Holding, LLC v. Aspen Am. Ins. Co.*, 2014 WL 28600, at *11 (S.D.N.Y. 2014), *aff'd*, 581 F. App'x 49 (2d Cir. 2014) (granting summary judgment to insurer, finding no "bad faith" conduct where the insurer and insured "had a legitimate dispute as to the interpretation" of the policy, the insurer promptly conducted its investigation, and paid the undisputed portion of the claim.); *Zarour v. Pac. Indem. Co.*, 113 F. Supp. 3d 711 (S.D.N.Y. 2015) (granting summary judgment to insurer on consequential damages claim and finding no bad faith when dispute is over the extent and amount of the loss or damage); *Ebrahimian v. Nationwide Mut. Fire Ins. Co.*, 960 F. Supp. 2d 405, 417 (E.D.N.Y. 2013) (granting summary judgment to insurer on consequential damages, finding that a "general disproval" [sic] of the claims handling process by an insured "does not suffice to state a cause of action for bad faith disclaimer of insurance coverage."); *Sunrise One, LLC v. Harleysville Ins. Co. of New York*, 293 F. Supp. 3d 317, 328 (E.D.N.Y. 2018) (finding "no genuine issue of material fact regarding Harleysville's good faith in assessing Sunrise's claims and denying coverage."). As discussed below, this Court should similarly dismiss 99 Wall's unsupported claims for consequential damages as 99 Wall cannot meet its burden.

**1.     Allied World Has a Legitimate Coverage Dispute and Did Not Breach the Covenant of Good Faith and Fair Dealing**

To survive summary judgement on a claim for consequential damages in the insurance context, 99 Wall must first prove that Allied World breached the covenant of good faith and fair dealing. To establish an insurer's breach of the duty of good faith and fair dealing, "the insured must demonstrate that 'no reasonable carrier would, under the given facts' deny coverage." *Sukup v. State of New York*, 19 N.Y.2d 519 (1967). A "[m]ere difference of opinion between an insurer and an insured over the availability of coverage" is insufficient. *Sunrise One, LLC*, 293 F. Supp.

3d at 327–28; *Utica Mut. Ins. Co.*, 238 F. Supp. 3d at 330 (holding that an insured must demonstrate that there was "no arguable basis to challenge its claim and further show that no reasonable carrier would, under the given facts, challenge the claim—in other words that the challenge was more than a difference of opinion.").

The undisputed evidence in this case demonstrates that Allied World possessed, at a minimum, "an arguable basis to challenge [99 Wall's] claim." *Utica Mut. Ins. Co.*, 238 F. Supp. 3d at 330. Specifically, the evidence shows that Allied World paid the undisputed physical damage portion of the claim.[68] With respect to the disputed delay claim, the evidence demonstrates that the Parties simply have a difference of opinion regarding coverage and valuation.[69]

The facts of this case are directly analogous to *Utica Mut. Ins. Co.*, whereby the insured sought extra-contractual damages arising out of its insurer's alleged unfair claims handing.  In that case, the insured's allegations regarding the insurer's conduct largely mirrors 99 Wall's allegations against Allied World. Specifically, in *Uitica Mut. Ins. Co.*, the insured alleged that the insurer failed to adequately respond to its inquiries, repeatedly requested documents that were previously produced, and that the insurer's investigation of the claim constituted delay tactics. *Id.* at 331. However, the court in *Utica Mut. Ins. Co.* found that the "evidence does not come close to satisfying the high standard for sustaining a bad faith claim." *Id.* Instead, the court found that the "undisputed evidence demonstrates that FFIC had legitimate grounds for investigating and not yet paying Utica's claim by July 2009." *Id.* at 332. The court clarified that just because "Utica did not receive payment under the Certificates as quickly as it would have preferred does not render FFIC dilatory in its investigation." *Id.* Thus, "even drawing all inferences in favor of Utica . . . Utica

---

[68] Allied World's Rule 56.1 Statement at ¶¶11-16.
[69] Allied World has contemporaneously filed a separate motion for summary judgment regarding the proper measurement for determining whether 99 Wall sustained a loss-related delay.

cannot sustain its burden in opposition to summary judgment because it cannot show that FFIC had no arguable basis to challenge its claim nor can it prove that no reasonable carrier would, under the given facts, challenge the claim." *Id.*

Just as in *Utica Mut. Ins. Co.*, 99 Wall alleges that Allied World repeatedly requested duplicative documents, ignored information that 99 Wall previously produced, inadequately investigated the claim, and delayed its adjustment and review of 99 Wall's claims.  However, 99 Wall cannot point to any evidence that supports the baseless allegations in its Amended Complaint. Just as in *Utica Mut. Ins. Co.*, the evidence does not come close to satisfying the high standard for sustaining a bad faith claim. *Id.* Rather, the undisputed evidence demonstrates Allied World promptly investigated 99 Wall's claims, inspected the Project alongside 99 Wall's consultants, sent out reasonable document requests aimed at securing required information, and within four months of the second Water Event paid 99 Wall nearly every dollar 99 Wall sought to repair the damage caused by the Water Events.[70]

Moreover, the record is clear that Allied World worked with 99 Wall to collect information required to evaluate whether the Water Events delayed the Project's completion, and if so, to determine the extent of coverage available.[71] However, a complete delay-analysis could not be performed until any delay to the Project was realized upon completion of construction, which ultimately did not occur until 2018—by which time 99 Wall had already sued Allied World.[72] Because the delay claim could not be adjusted until the Project was completed, 99 Wall's assertion that Allied World's "inordinate delay" in making payment was in bad faith completely lacks merit.

---

[70] Allied World's Rule 56.1 Statement at ¶¶6-16.
[71] Allied World's Rule 56.1 Statement at ¶¶6-16.
[72] Allied World's Rule 56.1 Statement at ¶¶18-27.

Lastly, Allied World retained a "bad faith" expert who testified at deposition that Allied World "carried out a detailed and extensive investigation," "reasonably reached their conclusions, and that Allied World's "actions were consistent with industry custom and practice."[73] Mr. Evans concluded that "[w]hile there may be a bona fide dispute as to the extent of loss and application of coverage, Allied World's conclusion was reasonable."[74] By contrast, not only did 99 Wall fail to offer any expert opinions or testimony related to Allied World's conduct, it also failed to offer any expert opinion or testimony rebutting Mr. Evan's findings.[75] In fact, 99 Wall's "bad faith" expert, Colin Daigle, testified that he "made no determination about bad faith."[76]

Based on the foregoing record evidence, the fact that 99 Wall did not receive payments as quickly as it would have preferred does not render Allied World's investigation dilatory or ineffective. Moreover, 99 Wall cannot point to any evidence to support its allegation that Allied World tried to take advantage of 99 Wall's financial situation. The evidence demonstrates the opposite as Allied World gave 99 Wall a $600,000 unallocated advance to settle the delay claim. Although 99 Wall has expressed a general disapproval for Allied World Word's handling of its claim, a "general disproval" [sic] of the claims handling process by an insured does not amount to a "bad faith disclaimer of insurance coverage." *Ebrahimian*, 960 F. Supp. 2d at 417 (granting summary judgment to insurer on consequential damages). Accordingly, this Court should grant Allied World's motion for summary judgment and dismiss 99 Wall's claim for consequential damages as a matter of law.

### 2.      Allied World's Conduct Did Not Cause 99 Wall's Alleged Consequential Losses

---

[73] Allied World's Rule 56.1 Statement at ¶44.
[74] Allied World World's Rule 56.1 Statement at ¶44.
[75] Allied World World's Rule 56.1 Statement at ¶¶43, 45.
[76] Allied World's Rule 56.1 Statement at ¶42; C. Daigle Tr. at 155:1-156:12.

In New York, consequential damages are unavailable in insurance cases unless the plaintiff demonstrates that the alleged particular consequential damages sustained were "within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting." *Bi-Economy*, 10 N.Y.3d at 193. The purpose of consequential damages is "to compensate a party for reasonably foreseeable damages, [which] 'must be proximately caused by the breach' and must be proven by the party seeking them." *Id.* at 131 (quoting *Ashland Mgt. v. Janien*, 624 N.E.2d 1007, 1011 (N.Y. 1993) (citing *Kenford Co. v. County of Erie*, 493 N.E.2d 234 (N.Y. 1986). Thus, in order to prevail on its claim for consequential damages, 99 Wall must also prove that its alleged damages resulted directly from Allied World's breach of the covenant of good faith and fair dealing. *See Bi-Economy*, 886 N.E.2d 127; *Woodworth v. Erie Ins. Co.*, 2009 WL 1652258, at *1 (W.D.N.Y. 2009) ("To succeed on his consequential damages claim, [Plaintiff] must have suffered damages <u>resulting directly from</u> a breach of the implied covenant of good faith and fair dealing.") (emphasis added).

In this case, even if 99 Wall's damages were within the contemplation of the Parties as a probable result of a breach, 99 Wall cannot demonstrate a causal connection between its damages and Allied World's alleged conduct.  In its Amended Complaint, 99 Wall makes the following allegations linking its alleged consequential damages to Allied World's conduct:

> 46. Allied World's continuous delay had a substantial negative impact on the viability and profitability of the Project including, but not limited to, at least five buyers refusing to close on condominium units within the Project and canceling their purchase agreements, as well as a substantial amount of money lost in buyer concessions and discounts.
>
> 47. Allied World's continuous delay, and lack of overall assistance, forced 99 Wall to cover the mounting Project losses and Project delay costs out of pocket at a much greater overall expense to prevent the Project from snowballing into a further liquidity crisis.[77]

---

[77] ECF No. 28 at ¶¶46-47.

Based on the above, 99 Wall asserts that Allied World's delay in paying the claim caused damages to 99 Wall in the form of buyers canceling their purchase agreements and carrying costs. 99 Wall's expert, Colin Daigle, states the specific consequential damages sought by 99 Wall are as follows:[78]

| Bad Faith Claim Summary of Losses | Claim Amount |
| --- | --- |
| Sales Price Depreciation - Units Not Sold Prior to Flood | $   8,868,108 |
| Sales Price Depreciation - Cancelled Units | $   1,407,688 |
| Carrying Costs | $   5,002,836 |
| Cost of Capital | $      179,192 |
| | $ 15,457,824 |

However, even if 99 Wall could prove that such damages were in fact incurred, there is no evidence demonstrating that any such alleged costs were incurred <u>as a result of</u> Allied World's conduct. First, it is undisputed that Allied World paid 99 Wall $2.4M for the physical damage caused by the Water Events.[79]  Accordingly, 99 Wall had the funds it needed to make all repairs. Second, to the extent 99 Wall sustained additional damages, the evidence demonstrates that such damages were sustained as a result of the delay in construction on the Project rather than because of Allied World's conduct. As 99 Wall's expert has acknowledged, a delay analysis cannot be completed until the Project is complete. Moreover, even if Allied World had paid the entirety of 99 Wall's delay claim immediately following the Water Events (without investigation or analysis), there is no evidence that the Project would have been completed any sooner. There is simply no evidence that 99 Wall sustained consequential damages from Allied World's failure to pay the delay claim

---

[78] Exh. P at 4.
[79] Allied World's Rule 56.1 Statement at ¶11.

Project. Rather, the evidence demonstrates that 99 Wall's damages stem from a change in the market conditions.[80]

The facts of this case are readily distinguishable from the facts of the leading case on consequential damages, *Bi-Economy*, whereby the court found that the insurer's failure to "promptly adjust and pay the loss, result[d] in the collapse of the [insured's] business." *Bi-Economy*, 10 N.Y.3d at 195. By contrast, here, Allied World promptly paid 99 Wall's repair costs, and there is no evidence that the Parties' dispute over 99 Wall's delay claim had any impact on the timing of the Project's completion. *See generally Ebrahimian*, 960 F. Supp. 2d at 416–17 (where "the Plaintiffs [did] not adequately allege that they suffered any damages as a consequence of the Defendant's alleged bad faith refusal to pay their claims other than the damages associated with the alleged breach of the Policy)".

Consequently, this Court should grant Allied World's motion because 99 Wall cannot show that it suffered consequential damages as a direct result of Allied World's alleged mishandling of the claim.

### C.      99 Wall Cannot Sustain a Claim for Attorneys' Fees and Costs

The general rule in New York is that attorney's fees are the ordinary incidents of litigation and may not be awarded to the prevailing party unless authorized by agreement between the parties, state, or court rule." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir. 2003). And in the context of insurance disputes, specifically, at least one New York court has held that consequential damages resulting from a breach of good faith and fair dealing do not extend to attorney's fees. *Stein LLC v. Lawyers Title Ins. Corp.*, 100 A.D.3d 622, 623 (2d Dep't 2012).

---

[80] Specifically, 99 Wall's expert Colin Daigle calculated 99 Wall's consequential losses based on third-party market date provided by Corcoran, showing that real estate market conditions worsened over time. *See, e.g.,* Exh. P at 4 at ¶51.

However, New York acknowledges a narrow exception to the rule prohibiting claims for attorney's fees in the insurance context in *Sukup v. State of New York*, 19 N.Y.2d 519, 522 (1967). Specifically, in *Sukup*, the court held that an insured could recover attorney's fees if it could make "a showing of such bad faith in denying coverage that no reasonable carrier would, under the given facts, be expected to assert it." *Id.*  And, although this Court previously elected not to dismiss 99 Wall's claim for attorneys' fees and costs at the motion to dismiss stage, it acknowledged that "[t]o be frank, the Court is skeptical that Plaintiff can make such a showing" and that "the likelihood that plaintiff will be able to recover attorney's fees is small."[81]

For all of the reasons outlined in Section IV(B) of this brief, 99 Wall cannot make a showing that Allied World's actions constitutes a breach of the covenant of good faith and fair dealing. *Sukup* 19 N.Y.2d at 522. Accordingly, the Court should grant Allied World's motion for summary judgement and dismiss 99 Wall's claim for attorneys' fees and costs as a matter of law.

## V.    CONCLUSION

Allied World respectfully requests this Court grant Allied World's motion for summary judgment as 99 Wall cannot sustain a claim for consequential damages as a matter of law. Accordingly, 99 Wall's claim for attorneys' fees and costs against Allied World must also be dismissed.

---

[81] ECF No. 102 at 9.

Dated: September 14, 2020
      New York, New York
                        ZELLE LLP

                        Matthew L. Gonzalez, Esq.
                        Isabella Stankowski-Booker, Esq.
                        Peter Kelly Golfman, Esq.
                        Jennifer Hoffman, Esq.
                        *Attorneys for Allied World Specialty*
                        *Insurance Company*
                        45 Broadway, Suite 920
                        New York, New York 10006
                        Tel.: (646) 876-4410

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on September 14, 2020, a true and correct copy of this Memorandum of Law was served by electronic means *via* the Court's CM/ECF electronic filing system upon all attorneys of record.


Dated: 9/14/2020
      New York, New York                  ZELLE LLP


                                             _____
                                             Matthew L. Gonzalez, Esq.
                                             Isabella Stankowski-Booker, Esq.
                                             Peter Kelly Golfman, Esq.
                                             Jennifer Hoffman, Esq.
                                             *Attorneys for Allied World Specialty*
                                           *Insurance Company*
                                           45 Broadway, Suite 920
                                           New York, New York 10006
                                           Tel.: (646) 876-4410