+-*UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

99 WALL DEVELOPMENT INC.,

     Plaintiff,

v.

ALLIED WORLD SPECIALTY INSURANCE
COMPANY, f/k/a DARWIN NATIONAL
ASSURANCE COMPANY,

     Defendant.

Civil Action No.: 1:18-cv-00126-RA

November 2, 2020

### 99 WALL DEVELOPMENT INC.'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S PARTIAL MOTION FOR SUMMARY JUDGMENT REGARDING 99 WALL'S PLEAS FOR CONSEQUENTIAL DAMAGES AND ATTORNEYS' FEES

Saxe Doernberger & Vita, P.C.

Tracy Alan Saxe
Philip M. Brown Wilusz
35 Nutmeg Drive, Suite 140
Trumbull, Connecticut 06711
Telephone:    203-287-2100
Fax:    203-287-8847
Email:    tas@sdvlaw.com
          pbw@sdvlaw.com

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ............................................................................................ ii

I.      Introduction.......................................................................................................1

II.     Factual Background ..........................................................................................1

        a.   The Project, Policy and the Loss ...............................................................2

        b.   The Claim ..................................................................................................3

             i.    Allied World's Initial Adjustment of the claim ...........................3

             ii.   Allied World's Continued Bad Faith Behavior ..........................5

III.    Procedural Background....................................................................................6

IV.     Argument ..........................................................................................................7

        a.   Summary Judgment is an Exceedingly High Standard, that Carries a Heavy
             Burden ......................................................................................................7

        b.   There are Genuine Issues of Material Fact as to Whether ALLIED WORLD
             Acted in Bad Faith....................................................................................8

             i.    99 Wall is Entitled to Consequential Damages Under New York
                   Law because Allied World acted in Bad Faith ...........................8

             ii.   Allied World Because of its Bad Faith action is Unable to
                   Establish That It Had a Legitimate Coverage Dispute Which
                   Absolved it From its Duty to Act in Good Faith and Fair Dealing.......... 10

             iii.  99 Wall's Damages Were Reasonably Foreseeable to Allied
                   World and There Exists  Genuine Issues of Material Fact that
                   Precluded Summary Judgment ...............................................18

        c.   There is a Genuine Issue of Material Fact as to Whether or Not 99 Wall Can
             Sustain a Claim for Attorneys' Fees and  Costs  ......................................29

V.      Conclusion .....................................................................................................29

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Acquista v. New York Life Ins. Co.,* 285 A.D.2d 73, 730 N.Y.S.2d 272 (2000) .................. 23

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). ........................................................ 7

*Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*, 886 N.E.2d 127 (N.Y. 2008).
..................................................................................................................................... 8,9,18,24

*Carden v. Allstate Ins. Co.*, 30 Misc. 3d 479, 912 N.Y.S.2d 867 (Sup. Ct. 2010);
................................................................................................................................................. 11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)........................................................................ 8

*Core Sec. SDI Corp. v. Albany Med. Center,* 1:18-cv-167, 2019 WL 1228550,
(N.D.N.Y. Mar. 15, 2019 .................................................................................................. 11

*Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134 (2d Cir. 2012) .................... 7

*Gauthier v. Countryway Ins. Co.*, 100 A.D.3d 1062, 953 N.Y.S.2d 346
(3rd Dep't. 2012) ............................................................................................................... 11

*Kenford Co. v. Cty. of Erie*, 537 N.E.2d 176 (N.Y. 1989)....................................................... 9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ............................ 7

*One Place Condo., LLC v. Travelers Prop. Cas. Co. of Am.*, No. 11 C 2520, 2015
WL 2226202,  (N.D. Ill. Apr. 22, 2015) ................................................................................. 18

*Panasia Estates, Inc. v. Hudson Ins. Co.*, 10 N.Y.3d 200, 886 N.E.2d 135, (2008) ............9

*Pandarakalam v. Liberty Mut. Ins. Co.*, 137 A.D.3d 1234 (N.Y. 2016) .............................. 10

*Quick Response Commercial Div. v. Cincinnati Ins. Co.*, No. 1:14-CV-779 GLS/DEP,
2015 WL 5306093 (N.D.N.Y. Sept. 10, 2015) ...................................................................18,23

*Redd v. N.Y. State Div. of Parole*, 678 F.3d 166 (2d Cir. 2012) ............................................ 8

*Roemer v. Allstate Indem. Ins. Co.*, 163 A.D.3d 1324,82 N.Y.S.3d 202,
(3rd Dep't. 2018) ................................................................................................................ 12

*Roman Catholic Diocese of Rockville Ctr. v. Gen. Reinsurance Corp.*, 2016 WL 5793996, at
(S.D.N.Y. Sept. 23, 2016)...................................................................................................10

*Rotuba Extruders, Inc. v. Ceppos*, 46 N.Y.2d 223(1978) ............................................................ 7

*Schoolcraft v. City of New York*, 103 F. Supp. 3d 465,(S.D.N.Y. 2015) .............................. 8

*Stern v. Trustees of Columbia Univ. in City of New York,* 131 F. 3d 305 (2d Cir. 1997)
..................................................................................................................................................................7,8

*Sukup v.* State, 19 N.Y.2d 519, 281 N.Y.S.2d 28, N.E.2d 842 (1967),...............................13,24

*Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). ...........................................................8

*Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.*, 238 F.Supp.3d 314 (N.D.N.Y. 2017),..... 13

*Valentine v. Standard & Poor's*, 50 F. Supp.2d 262(S.D.N.Y. 1999), .................................. 7

*Westinghouse Elec. Corp. v. N.Y. City Trans. Auth.*, 735 F. Supp. 1205 (S.D.N.Y. 1990)
.................................................................................................................................................................. 8

*Whiteface Real Estate Dev. & Constr., LLC v. Selective Ins. Co. of Am.*, No. 08–cv–24,
2010 WL 2521794 (N.D.N.Y. June 16, 2010 .......................................................................22,23

## **Rules**

Fed. R. Civ. P. 56(c)........................................................................................................................ 7

## **REFERENCE**

Michael A. Stover, *A Guide to Builder's Risk Insurance*, 53 Tort Trial & Ins. Prac.
L.J. 819, 820 (2018) .................................................................................................................... 18

## I.     INTRODUCTION

The Plaintiff in the above captioned case, 99 Wall Development, Inc. ("99 Wall") opposes the Partial Summary Judgment Motion regarding 99 Wall's pleas for consequential damages and attorneys' fees (the "Motion") filed by Defendant Allied World Specialty Insurance Company, f/k/a Darwin National Assurance Company ("Allied World"). This case involves an insurance coverage dispute arising out of Allied World's failure to fully cover delay-related losses suffered by 99 Wall due to two water-related losses that negatively impacted 99 Wall's construction development project located at 99 Wall Street in Manhattan, N.Y. (the "Project").

Allied World's Motion should be denied because there is a genuine dispute as to material facts, specifically, whether or not Allied World acted in bad faith in its adjustment and handling of 99 Wall's claim. Despite Allied World's contention that it is entitled to summary judgment because there was a legitimate coverage dispute surrounding the claim, the presence of an alleged dispute does not absolve it of its duties to act with good faith and fair dealing with respect to its obligations under the contract. Similarly, the facts presented in Allied World's motion fall woefully short of establishing the lack of a dispute of *any* material fact with respect to its alleged bad faith conduct. Rather, Allied World's motion is a last-ditch attempt to hide from, and avoid facing, the ultimate arbiter of its bad faith conduct, a jury. Because there exist genuine disputes of material fact as to whether or not Allied World acted in bad faith, Allied World's Motion for Partial Summary Judgment Regarding 99 Wall's Pleas for Consequential Damages and Attorneys' Fees must be denied.

## II.     FACTUAL BACKGROUND

### a.   The Project, Policy, and The Loss

The present dispute arises out of two separate loses which occurred at the insured project located at 99 Wall Street, New York, NY 10005. In 2015, 99 Wall began making plans to convert a 29-story commercial use building located at 99-101 Wall Street into individual condominium units.[1] In conjunction with its subcontractor, T.G. Nickel & Associates, LLC, 99 Wall developed a phased completion model, whereby individual units would be sold as completed.[2] In conjunction with this phased construction plan, 99 Wall obtained financing which was to be paid off as individual units were sold and completed.[3]

99 Wall also purchased a builder's risk policy from Allied World bearing Policy No. 0309-1656 (the "Policy") and covering the building under construction at 99-101 Wall Street.[4] Recognizing the importance of keeping the Project on schedule, 99 Wall purchased the Policy to provide for prompt reimbursement in the event of a Loss.[5] By way of endorsement, 99 Wall also purchased Delay coverage under the Policy to provide coverage for any consequential damages that might result from a covered loss.[6]

Construction began on the project on or about May of 2015.[7] After experiencing some preliminary delays in construction, T.G. Nickel and 99 Wall modified its phased construction plan slightly.[8] Under the new plan, construction was separated into two sections; TCO 1 (floors 6

---

[1] 99 Wall's Rue 56.1 Statement at ¶ 1.
[2] *Id*. at ¶ 3.
[3] *Id*. at ¶ 4.
[4] *Id*. at ¶ 5.
[5] *Id*. at ¶¶ 6 and 10.
[6] *Id*. at ¶ 7.
[7] *Id*. at ¶ 11.
[8] *Id*. at ¶ 13.

through 16) and TCO 2.[9] By July of 2016, a significant amount of the Project, including units on floors 6 through 16, were due to be completed within one month.[10]

In 2016, the Project suffered two separate losses under the Policy. First, on or about July 19, 2016, a rainstorm caused significant damage to the elevator shaft and elevator controllers.[11] On or about October 6 or 7 of 2016, the Project suffered a second significant loss when a water tank located on the 25th floor leaked.[12] Damage occurred to elevator shafts, staircases, and unfinished and completed units throughout the Project.[13]

### b.  The Claim

#### i.  Allied World's Initial Adjustment of the Claim

99 Wall promptly notified Allied World of the losses and stressed the importance of quick resolution and funding of the claims.[14] 99 Wall made clear that it was seeking coverage for physical costs of repairs, general conditions, soft costs, and delay damages.[15] Allied World sought a wealth of information from 99 Wall, all of which were complied with by 99 Wall.[16] In response, Allied World retained J.S. Held to assist with the evaluation and settlement of the delay claim and Mattes, Driscoll, and Damico ("MD&D") to assist in damages calculations.[17] Well aware of the phased construction plan, Allied World notified 99 Wall—and instructed J.S. held—to evaluate the delay period based upon the projected completion date of TCO 1.[18] Allied World assured 99 Wall that it

---

[9] *Id*. at ¶ 14.
[10] *Id*. at ¶ 15.
[11] *Id*. at ¶ 16.
[12] *Id*. at ¶ 20.
[13] *Id*. at ¶ 21.
[14] *Id*. at ¶¶ 22; 24.
[15] *Id*. at ¶ 23.
[16] *Id*. at ¶ 29.
[17] *Id*. at ¶¶ 27, 33-4; J. Roskop Tr. P. 23:4-18.
[18] *Id*. at ¶¶ 26-7.

would analyze the delay claim as a phased construction project and not using a single completion date.[19]

As months progressed, however, it became clear that Allied World was in no rush to pay amounts owed to 99 Wall under the Policy. Allied World repeatedly requested information from 99 Wall which was already in its possession and claimed that it needed additional time to process the claim.[20] Despite Allied World's delay, some progress had been made by December of 2016, when Allied World confirmed to 99 Wall that there was at least a 90-day delay period for the second loss."[21] By February of 2017, Allied World informed 99 Wall that its evaluation was complete, finding that there was no delay period for the first loss.[22] While J.S. Held's initial report found a delay period of 105 days for the second loss, it is now clear that Allied World was preparing to negotiate the settlement of the claims on the basis of two separate losses in order to apply two waiting periods to the loss.[23] According to the testimony of Allied World's own bad faith expert, Peter Evans, Allied World's sudden change of course and calculation utilizing two waiting periods allowed it to reduce its stated value of the case by $128,800.[24] Despite the report being completed in January of 2017, Allied World did not share the findings of the J.S. Held Report during the adjustment phase.[25] Even at the key adjustment meeting in March of 2017, Allied World did not share its report, or inform 99 Wall that it had confirmed that there was at least 105 days of delay. Following the unsuccessful meeting in March of 2017, Allied World then paid $600,000 to 99 Wall for what it now claims was the undisputed amount of the delay claim, but at the time it

---

[19] *Id*. at ¶ 28.
[20] *Id*. at ¶ 29-31.
[21] *Id*. at ¶ 32.
[22] *Id*. at ¶ 36.
[23] *Id*. at ¶¶ 47,53, 56.
[24] *Id*. at ¶ 56.
[25] *Id*. at ¶¶ 51; 56.

stated to be unallocated.[26] None of this payment, however, included general conditions associated with the repair of physical damage.[27]

### ii. Allied World's Continued Bad Faith Behavior

Following Allied World's lack of transparency and failure to pay amounts owed under the Policy, settlement talks broke down between the parties.[28] Allied World replaced the author of the original delay report, Doug DePhillips, with Lisa Enloe.[29] Allied World's adjuster stated that it did so in order to benefit Allied World.[30] Allied World paid Ms. Enloe in excess of $600,000 for her services.[31] Rather than having Ms. Enloe perform the same analysis as Mr. DePhillips, however, Allied World instructed her to analyze 99 Wall's delay claim based upon a single completion date, rather than the phased completion approach that was understood between the parties and utilized by Mr. DePhillips.[32] Allied World further instructed Ms. Enloe not to utilize a critical path method in analyzing 99 Wall's delay a claim, and to use the "but for" method, an additional departure from the previously accepted analysis of Mr. DePhillips.[33] Allied World did so despite its Vice President, Paul Aviles, testifying that he had never before instructed an expert to utilize any method of schedule analysis other than a critical path method.[34] Experts in Ms. Enloe's field all agree that the critical path method is the best method, and that the "but for" method is disfavored and prone to errors.[35] Further, while Ms. Enloe has claimed that the critical path method cannot be used in the insurance context, and that she did not utilize it in her analysis, other experts agree that the

---

[26] *Id*. at ¶54.
[27] *Id*. at ¶¶ 57-59.
[28] *Id*. at ¶ 60.
[29] *Id*.
[30] *Id.* at ¶¶ 65-6.
[31] *Id*. at ¶ 62.
[32] *Id*. at ¶¶ 64-8.
[33] *Id*. at ¶¶ 73-74.
[34] Id. at ¶ 69.
[35] Id. at ¶¶ 73, 76.

critical path method is used in the insurance context, and that even Ms. Enloe's flawed "but for" method requires the use of a critical path analysis.[36] Ms. Enloe's analysis, as well as Allied World's subsequent interpretation of the Policy language, was a complete and total departure from Allied World's previous representations to 99 Wall.[37] Ms. Enloe testified that, had she analyzed the claim under the same directions and assumptions as Mr. DePhillips, she would have found a compensable loss.[38] Similarly, Allied World's bad faith expert, Peter Evans, testified that he was not familiar with any instances where an insurer instructed experts to analyze delay based upon two different completion assumptions, and further that he could not recall another situation where two experts were engaged by an insurance company to perform two separate delay analyses.[39] Unsurprisingly, based on the warped assumptions provided by Allied World, given to serve their own best interests, Ms. Enloe's report concluded that, in contrast to Mr. DePhillips' finding of 105 days of delay, there was not a single day of compensable delay for the second loss.[40] Relying on Ms. Enloe's commissioned report, Allied World concluded that 99 Wall was not entitled to coverage for any period of delay beyond the $600,000 paid for the allegedly "undisputed" amount.[41]

## III.    PROCEDURAL BACKGROUND

99 Wall initiated the present action by filing its initial Complaint on January 8, 2018.[42] 99 Wall subsequently filed its Amended Complaint on March 6, 2018.[43] Following this Court's denial of Allied World's Motion to Dismiss on January 28, 2019[44], the parties engaged in extensive

---

[36] Id. at ¶¶73,77-79.
[37] *Id*.
[38] *Id*. at ¶ 70.
[39] *Id*. at ¶¶ 69 and 85.
[40] *Id*. at ¶ 84.
[41] *Id*. at ¶ 55.
[42] Docket, ECF No. 1, Complaint.
[43] Docket, ECF No. 28, Amended Complaint.
[44] Docket, ECF No. 102, Transcript.

discovery which was completed on June 30, 2020. Following the close of discovery, on September 14, 2020, Allied World moved for summary judgment on 99 Wall's claim for consequential damages and attorneys' fees arising out of Allied World's bad faith conduct and on the methodology for measuring delay.[45] 99 Wall now responds to Allied World's Motion for Partial Summary Judgment Regarding 99 Wall's Please for Consequential Damages and Attorneys' Fees. 99 Wall responds to Allied World's other motion for summary judgment under separate cover.

## IV. ARGUMENT

### a. Summary Judgment is An Exceedingly High Standard, that Carries a Heavy Burden

"[S]ummary judgment is a drastic remedy and should not be granted where there is any doubt as to the existence of a triable issue." *Rotuba Extruders, Inc. v. Ceppos*, 46 N.Y.2d 223, 231 (1978) (internal citations or quotations omitted). Summary judgment may be granted only "when the pleadings, depositions, answers to interrogatories, and admissions to file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Valentine v. Standard & Poor's*, 50 F. Supp.2d 262, 280 (S.D.N.Y. 1999), *citing* Fed. R. Civ. P. 56(c) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A reviewing court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997).

---

[45] Docket, ECF Nos. 197-200.

"The moving party bears the initial burden of informing the district court of the basis for its motion and identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Id.*, *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial." *Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 501 (S.D.N.Y. 2015), *citing Westinghouse Elec. Corp. v. N.Y. City Trans. Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990). Thus, summary judgment is appropriate "only when, with all permissible inferences and credibility questions resolved in favor of the party against whom judgment is sought, there can be but one reasonable conclusion as to the verdict, i.e., it is quite clear what the truth is." *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (internal quotation marks omitted). A court "may only affirm if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle [him] to relief." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

### b. There are Genuine Issues of Material Fact as to Whether Allied World Acted in Bad Faith

#### i. 99 Wall is Entitled to Consequential Damages Under New York Law Because Allied World Acted in Bad Faith

In a case very similar to ours, where the insured was making a business interruption claim under a commercial property policy, the Court of Appeals of new York established the standard for a court's analysis of a claim for consequential damages arising out of the breach of the covenant of bad faith and fair dealing in New York in *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187, 194, 886 N.E.2d 127, 131 (2008). "Implicit in contracts of insurance is a covenant of good faith and fair dealing, such that a reasonable insured would understand that the insurer promises to investigate in good faith and pay covered claims." *Bi-Econ. Mkt., Inc.*, 10

N.Y.3d at 194. In considering a claim for consequential damages arising out of a business interruption claim, the Court of Appeals noted that such insurance is purchased to sustain business operations in the event of a loss: "The purpose served by business interruption coverage cannot be clearer—to ensure that [the insured] had the financial support necessary to sustain its business operation in the event disaster occurred. Certainly, many business policyholders, such as Bi–Economy, lack the resources to continue business operations without insurance proceeds." *Id.* at 194-5. The Court held that damages for business interruption losses were squarely within the contemplation of the parties to the policy, noting that "the purpose of the contract was not just to receive money, but to receive it promptly so that in the aftermath of a calamitous event…the business could avoid collapse and get back on its feet as soon as possible." *Id.* at 195.

As part of a breach of contract action, a party may recover not only those damages which are "the natural and probable consequence of the breach," but also special or consequential damages. *Id.* at 192. It is well established under New York law that "[a]n insured may recover foreseeable damages, beyond the limits of its policy, for breach of a duty to investigate, bargain for and settle claims in good faith." *Panasia Estates, Inc. v. Hudson Ins. Co.*, 10 N.Y.3d 200, 203, 886 N.E.2d 135, 136–37 (2008) (internal citations omitted). Consequential damages are available so long as they were "within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting." *Kenford Co. v. Cty. of Erie*, 73 N.Y.2d 312, 319, 537 N.E.2d 176, 178 (1989) (internal citations omitted).

"It is not necessary for the breaching party to have foreseen the breach itself or the particular way the loss occurred, rather, '[i]t is only necessary that loss from a breach is foreseeable and probable.'" *Bi-Econ. Mkt., Inc.*, 10 N.Y.3d at 193. In *Bi-Economy,* the New York Court of Appeals decided the insurer's motion for summary judgment on the issue of whether or not the

insured was entitled to consequential damages. The Court noted that a party breaching a contract may be liable for all foreseeable and probable damages that result from such breach. *Bi-Economy*, 10 N.Y.3d at 192-93. "In its decision, the Bi-Economy court set forth the necessary elements for such a claim: that (1) such consequential damages were a natural and probable consequence of the breach of contract, (2) were or should have been foreseeable, and (3) were reasonably contemplated by the contracting parties at the time the Policy was issued." *Roman Catholic Diocese of Rockville Ctr. v. Gen. Reinsurance Corp.*, 2016 WL 5793996, at *4 (S.D.N.Y. Sept. 23, 2016).

Finally, in order to prevail on a motion for summary judgment dismissing a claim for consequential damages, the insurer "must make a prima facie showing that the damages sought were a type of damage not within the contemplation of the parties when they executed the insurance policy." *Pandarakalam v. Liberty Mut. Ins. Co.*, 137 A.D.3d 1234, 1236, 29 N.Y.S.3d 413 (2016) (internal citation omitted). "A defendant does not meet its burden of affirmatively establishing its prima facie entitlement to judgment as a matter of law 'by merely pointing to gaps in the plaintiff's case; rather, it must affirmatively demonstrate the merits of its defense.'" *Id.* (internal citation omitted).

> ### ii. Allied World, Because of its Bad Faith Actions, is Unable to Establish That it Had a Legitimate Coverage Dispute Which Absolved It From Its Duty to Act in Good Faith and Fair Dealing

Allied World falls woefully short of carrying its burden that there is no genuine issue of material fact with respect to its bad faith conduct, and as such, summary judgment should be denied.[46] First, 99 Wall notes that Allied World conflates its breach of contract with its obligations

---

[46] Allied World incorrectly states that in order to survive summary judgment on a claim for consequential damages, "99 Wall must prove that Allied World breached the covenant of good faith and fair dealing." Allied World's Memorandum of Law in Support of Its Motion for Partial summary Judgment Regarding 99 Wall's Pleas for Consequential Damages and Attorneys' Fees, p. 15. That is an inaccurate statement of the law. Rather, it is *Allied*

to act in good faith in its handling and negotiation of the claim. 99 Wall's claim for consequential damages focuses not on whether or not there existed a "legitimate coverage dispute," but rather whether or not Allied World performed its obligations under the contract in good faith. "While New York does not recognize an independent tort cause of action for an insurer's failure to perform its contractual obligations under an insurance policy, where an insurer breaches its duty to investigate, bargain, and settle claims in good faith, consequential damages for breach of contract may be recovered not limited by the amount specified in the insurance policy." *Carden v. Allstate Ins. Co.*, 30 Misc. 3d 479, 482, 912 N.Y.S.2d 867, 870 (Sup. Ct. 2010); *See also Core Sec. SDI Corp. v. Albany Med. Center*, 1:18-cv-167, 2019 WL 1228550, at *1 (N.D.N.Y. Mar. 15, 2019) ("It is possible for a party to not breach any express contractual provisions, yet breach the contract by breaching the implied covenant."). Certainly, 99 Wall maintains its position that Allied World breached its contract, however, 99 Wall also contends that Allied World did not act in good faith in carrying out its obligations under the contract. Stated differently, the focus for the Court's review of Allied World's Motion for Summary Judgment is on the factual circumstances surrounding its investigation and continued adjustment of the claim, not on whether or not Allied World had a coverage dispute which justified its denial of coverage.

New York courts are clear that insurers must act in good faith, even if they can establish the existence of a coverage dispute. *See e.g., Gauthier v. Countryway Ins. Co.*, 100 A.D.3d 1062, 1063–64, 953 N.Y.S.2d 346, 348–49 (3rd Dep't. 2012) (denying insurer's motion for summary judgment requesting to dismiss consequential damages, based on plaintiff's allegations that defendant failed to investigate and pay their claim in a timely and good faith manner, which resulted in increased damage to the insured property, necessary code upgrades, the purchase of a

---

*World's* burden on summary judgment to establish that it acted in good faith, and all 99 Wall need to do to defeat summary judgment is establish that there exists an issue of material fact that Allied World failed to act in good faith.

double-wide mobile home so the insured would have a place to live, and counsel fees). In *Roemer v. Allstate Indem. Ins. Co.*, 163 A.D.3d 1324, 1326, 82 N.Y.S.3d 202, 205 (3rd Dep't. 2018), for example, the Court denied the insurers motion for summary judgment to dismiss bad faith claims after the insurer failed to present any admissible evidence in support of its motion to explain why, after 16 months of investigation, it only disclaimed coverage after the parties' independent appraisers had reached a mutual agreement as to the amount of loss incurred. The insureds immediately filed a claim with Allstate after a fire burnt down their residence. *Id.* at 1324. Allstate proceeded as if there was coverage for the loss, providing payment for additional living expenses and demanding appraisal to determine the amount of the loss. *Id.* at 1326. After the appraisers agreed to the amount of the loss, and sixteen months after the date of loss, Allstate disclaimed coverage. *Id.* The insureds subsequently filed suit, alleging causes of action for breach of contract and breach of the covenant of good faith and fair dealing. *Id*. at 1324-25. Allstate moved for summary judgment on plaintiffs claim for breach of the covenant of good faith and fair dealing, arguing that there was no evidence demonstrating that it acted in bad faith. *Id.* at 1326. The Court denied Allstate's motion, finding that it failed to explain why it disclaimed coverage after sixteen months of investigation, and further, that at no point during the claims process did Allstate "ever indicate to plaintiff that coverage might ultimately be denied." *Id*. at 1327.

Allied World's conduct in this case is analogous to Allstate's conduct in Roemer where the Court found that Allstate was not entitled to summary judgment due to the presence of evidence of bad faith. *Id.* at 1327. In this case, Allied World negotiated and adjusted the claim with 99 Wall based upon a phased completion analysis, and commissioned an expert report finding a delay period of at least 105 days. When 99 Wall would not accept Allied World's low ball offers, however, Allied World retained Ms. Enloe, for an exorbitant amount of money, to calculate a new

delay period that would be beneficial to Allied World. Based upon Ms. Enloe's conclusions, and the different assumptions and analysis Allied World provided to her to reach those conclusions, Allied World denied coverage.

Additionally, these cases illustrate the notion that, despite Allied World's argument, the focus is not exclusively on whether there was a legitimate coverage dispute, but on the conduct of Allied World in adjusting the claims. Though Allied World articulates this standard to try and excuse it from its bad faith conduct, New York law is clear that bad faith conduct may be found even where there is a legitimate coverage dispute.

In its argument, Allied World relies heavily upon *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.*, 238 F.Supp.3d 314 (N.D.N.Y. 2017), arguing that the facts of the present case are directly analogous.[47] The Court's holding in *Utica* is not as broad as Allied World suggests, however. In *Utica*, the Court granted defendant's motion for summary judgment on plaintiff's bad faith claim, in which it sought "attorneys' fees and other costs in connection with [the] lawsuit." *Utica Mut. Ins. Co.*, 238 F.Supp.3d at 329. The Court cited *Sukup v. State*, 19 N.Y.2d 519, 281 N.Y.S.2d 28, N.E.2d 842 (1967), stating that in order to "prevail on such a claim and 'impose an extra-contractual liability for legal expenses,' 'more than an arguable difference of opinion between carrier and insured over coverage' is required." *Utica Mut. Ins. Co.*, 238 F.Supp.3d at 329 *citing Sukup*, 19 N.Y.2d at 522. In its decision, the Court focused primarily on the standard articulated in *Sukup* for attorney's fees, not the standard articulated in *Bi-Economy* for consequential damages. *Id.* at 330-32.

*Utica Mut. Ins. Co.* is inapposite for two reasons. First, Allied World again conflates its denial of coverage and breach of contract with its bad faith conduct. 99 Wall does not argue that

---

[47] Allied World's Memorandum of Law in Support of Its Motion for Partial summary Judgment Regarding 99 Wall's Pleas for Consequential Damages and Attorneys' Fees, p. 16-7.

Allied World's denial alone entitles it to consequential damages, but rather argues that Allied World's bad faith conduct combined with its denial, allows it to recover the consequential damages. As such, the inquiry cannot be limited to whether or not there was an arguable basis for coverage but should also take into consideration Allied World's bad faith conduct which directly caused 99 Wall's consequential damages. Second, the Court in *Utica Mut. Ins. Co.* based its decision on plaintiff's claim for attorneys' fees and other costs in connection with the lawsuit, not consequential damages arising out of defendant's denial. Such was the case in *Sukup*, where the Court of Appeals articulated the standard with respect to a claim for legal expenses, not consequential damages. *Sukup*, 19 N.Y.2d at 522 ("It would require more than an arguable difference of opinion between carrier and insured over coverage to impose an extra-contractual liability *for legal expenses* in a controversy of this kind. It would require a showing of such bad faith in denying coverage that no reasonable carrier would, under the given facts, be expected to assert it.") (emphasis added). Allied World attempts to use this heightened standard in the context of a claim for consequential damages, when in reality such a standard is used to assess an insured's entitlement to attorneys' fees and costs.

Even if Allied World's articulation of New York law were correct and the *Sukup* standard were appropriate, there are still genuine issues of material fact as to whether or not there was a legitimate coverage disagreement in this instance. In this case, unlike in any of the other cases cited by Allied World, there is no legitimate dispute as to whether the delay in this instance is covered. Instead, Allied World's basis for denying coverage stems from their measurement of that delay, and the warped and inaccurate instructions that they provided to their expert in order to ensure that that measurement eliminated coverage.

Allied World's own vice president, and relevant delay analysis experts, all confirm that the Policy does not mandate whether the Policy requires phased completion or total project completion.[48] This is why Allied World originally tasked its experts with analyzing the loss in the exact same manner that 99 Wall analyzed the loss. Allied World's evolving positions with respect to the interpretation of 99 Wall's delay coverage was so outrageous that no carrier would have asserted it. Indeed, Peter Evans, Allied World's own bad faith expert, testified that he was not familiar with any instances where an insurer instructed experts to analyze delay based upon two different completion assumptions, and further that he could not recall another situation where two experts were engaged by an insurance company to perform two separate delay analyses.[49]

Similarly, under the plain language of the Policy, Allied World's contention in litigation that 99 Wall suffered zero days of delay is so outrageous that no insurer would raise such a defense to coverage. Allied World's previously commissioned report from Douglas DePhillips finding 105 days of delay says so, and it was only when Allied World provided Ms. Enloe with a faulty and disfavored method of analysis and an incorrect interpretation of the policy language that she produced her report finding zero days of delay.[50] Mr. DePhillips performed his analysis based on the critical path method, because he chose it himself, whereas Ms. Enloe was instructed to use the "but for" method by Allied World for its own benefit.[51] Allied World instructed Ms. Enloe to use the "but for" method, even though its vice president, Paul Aviles, testified that he had never instructed an expert to analyze a loss using anything other than the critical path method.[52] The "but for" method is disfavored in the community of experts, and in scholarly treatises on delay analysis,

---

[48] *99 Wall's Rule 56.1 Statement* at ¶¶ 64-68.
[49] *99 Wall's Rule 56.1 Statement* at ¶¶ 69 and 85.
[50] *Id.* at ¶¶ 47,53, 56. *See also* 99 Wall's Opposition to Allied World's Partial Motion for Summary Judgment on Methodology for Measuring Delay.
[51] *Id.* at ¶ 76.
[52] *Id.* at ¶ 71-72.

even in the insurance context.[53] Ms. Enloe also testified that if she had been told to analyze based on phased completion, she would have found a compensable loss like Mr. Beach and Mr. DePhillips.[54]  It was only Allied World's bad faith instructions that resulted in Ms. Enloe finding zero days of delay, not a legitimate coverage dispute.

As such, Allied World's contention that a bona fide dispute with respect to coverage excuses its bad faith conduct toward its insured is disingenuous at worst, and unsupported by New York law at best. New York law is clear that a claim for consequential damages arising out of an insurer's bad faith conduct is based upon conduct separate from the breach of contract. In fact, 99 Wall's claim, as is clear from the evidence developed during the discovery stage of this litigation, is based upon Allied World's delayed adjustment and handling of the claim, multiple and constantly changing interpretations of policy language, misleading delay calculation, and so on, all done not to adjust the claim but to benefit itself. As the evidence shows, Allied World did everything in its power to delay the payment of this claim and to reduce its liability. Not only did Allied World fail to pay any general conditions costs,[55] but even after it received DePhillips' report finding 105 days of delay, it refused to pay any part of the claim for three months.[56] Even once Allied World decided  to offer an undisputed payment of $600,000, such payment was based upon a calculation factoring in two delay periods.[57] Not only was this calculation a deviation from what Allied World previously represented to 99 Wall, in insisting that they negotiate only on the second loss, but it was also a clear attempt by Allied World to reduce its overall obligations for the claim.

---

[53] *Id.* at ¶¶ 71-73, 76.
[54] *Id.* at ¶ 70.
[55] *Id.* at ¶ 59.
[56] Id. at ¶ 51-4.
[57] *Id.* at ¶ 56.

As stated by Mr. Evans, Allied World's application of two waiting periods was inappropriate and allowed it to reduce its offer by $128,800:

> Q:   By adding on a second waiting period, they reduced in their own calculations $128,800 is that right?
>
> A:   Well they didn't reduce it. They found a way to get a payment out and it was apparently an error or a lack of information and they paid what they paid.
>
> Q:   Okay. But that error reduced the amount that they paid to the insured by 14 days times $9,200, right?
>
> A:   Assuming that's what they did, as opposed to $6,000, which was accepted by the insured.[58]

Allied World's conduct was a clear attempt to not only delay payment, but also significantly reduce its liability for the delay claim altogether, by taking advantage of 99 Wall's financial hardship, which Allied World had placed it in by refusing to pay this covered loss, and force 99 Wall to settle for less than it was owed. Therefore, even if 99 Wall were required to meet the heightened standard described by Allied World, there is certainly sufficient evidence of Allied World's egregious conduct to preclude summary judgment. Allied World continuously fails to address its bad faith conduct or provide any justification under law, and as such, a genuine issue of material fact exists as to whether or not Allied World acted in bad faith in its adjustment and handling of 99 Wall's claim.

Finally, even if Allied World were correct that there was no compensable delay, the Policy still provides coverage for general conditions as part of the property damage coverage. Allied World has acknowledged that at least $141,495.90 of that amount is owed,[59] and that general conditions are covered as repair costs, and yet Allied World has still failed to pay those costs.[60] Having acknowledged coverage for this amount of general conditions, and acknowledged that the

---

[58] P. Evans Tr. p. 119:6-19.
[59] Ex. 164 N. Sommerfeld Expert Report at p. 12
[60] *99 Wall Rule 56.1 Statement at ¶¶ 58-59.*

general conditions should have been adjusted as repair damages, there can be no explanation other than bad faith for their continued failure to pay those damages. Again, there is no legitimate coverage dispute, at least as to that amount specified by Allied World's own expert, and the failure to pay that amount clearly amounts to bad faith.

### iii.   99 Wall's Damages Were Reasonably Foreseeable to Allied World and There Exists Genuine Issues of Material Fact that Preclude Summary Judgment

When determining whether or not consequential damages were "reasonably contemplated" by the parties, courts consider "the nature, purpose and particular circumstances of the contract known by the parties." *Bi-Econ. Mkt., Inc.*, 886 N.E.2d at 130. "Specifically, in order to determine whether such damages were within the contemplation of the parties at the time of contracting, New York courts take into consideration whether there existed a specific provision in the policy itself permitting recovery for the loss." *Cont'l Info. Sys. Corp. v. Fed. Ins. Co.*, No. 02 CIV. 4168 (NRB), 2003 WL 145561, at *4 (S.D.N.Y. Jan. 17, 2003). "Courts also look at 'what liability the [insurer] fairly may be supposed to have assumed consciously, or to have warranted the [insured] reasonably to suppose that it assumed, when the contract was made.'" *Quick Response Commercial Div. v. Cincinnati Ins. Co.*, No. 1:14-CV-779 GLS/DEP, 2015 WL 5306093, at *4 (N.D.N.Y. Sept. 10, 2015) (internal citations omitted). With respect to insurance contracts, the New York Court of Appeals has recognized that such contracts are generally intended to provide protection against financial ruin in case of a loss. "An insured may also bargain for the peace of mind, or comfort, of knowing that it will be protected in the event of a catastrophe." *Id.*

As discussed in *Bi-Econ*, business interruption insurance, another type of first party coverage, is very similar in intent and purpose to builder's risk insurance. In fact, courts and other scholars have stated that insureds purchase builder's risk insurance to insulate against costly and lengthy project delays, so as to ensure financial security and peace of mind in the event of a loss.

*See e.g., One Place Condo., LLC v. Travelers Prop. Cas. Co. of Am.*, No. 11 C 2520, 2015 WL 2226202, at *6 (N.D. Ill. Apr. 22, 2015) ("In recognition of the fact that '[c]ommercial owners can incur significant damages if their projects are delayed,' insureds often obtain additional 'time element' or 'soft costs' coverage 'by endorsement to the builder's risk policy.'") (internal citations omitted); Michael A. Stover, *A Guide to Builder's Risk Insurance*, 53 Tort Trial & Ins. Prac. L.J. 819, 820 (2018) ("Builder's risk insurance is intended to provide prompt payment for losses to the project in order to minimize disruption."). Indeed, such foreseen losses are the exact reason that insurers like Allied World offer delay and soft costs endorsements to their policies, as they are well-aware of the importance of timely and efficient completion of large-scale commercial projects. In short, the importance of quickly completing projects and avoiding unnecessary delay is well-known to every individual, entity, and insurer in the construction industry.

In the present case, Allied World was well-aware of the potential damages that 99 Wall might suffer, and was suffering, as a result of its failure to promptly pay on its delay claim. 99 Wall repeatedly made Allied World aware of the importance of quickly adjusting and paying the claim, as the carrying costs and interest continuously accrued.[61] Additionally, Allied World had knowledge of 99 Wall's construction schedule and its relative intent.[62] 99 Wall and its general contractor, T.G. Nickel, agreed to a phased construction plan whereby it would be completed in two sections, TCO 1 and TCO 2.[63] As floors and units were completed, they would be given a temporary certificate of occupancy, upon which the units would be sold and the lender would be paid in order to quickly minimize debt and liquidate equity.[64] Allied World had substantive

---

[61] 99 Wall's Rule 56.1 Statement at ¶ 24.
[62] *Id.* at ¶ 14.
[63] *Id.* at ¶ 15.
[64] *Id*. at ¶ 14.

knowledge of this structure, as its insurable interest would change as units were sold and coverage ended for that respective section of the building.[65]

Similarly, 99 Wall's damages arise directly out of, and are directly attributable to, Allied World's bad faith conduct. As stated to Allied World on multiple occasions, 99 Wall's phased construction plan required sales of a certain amount of completed units prior to completion of the entire Project.[66] 99 Wall would use these profits to pay amounts due under the loans it took out from its lender, thereby reducing the principal on the loans and the amount of interest owed on loans.[67] Prior to the losses, 99 Wall had a number of contracts in place for condominium units within the building.[68] However, completion and occupancy of these units was delayed by the losses and as a result, purchasers with down payments on units threatened to back out.[69] At the same time, 99 Wall had to expend over six million dollars of its own funds to pay interest and fees to its lender, other carrying and soft costs, and general conditions which Allied World refused to pay.[70] This expenditure of unplanned money, that Allied World refused to cover despite promising to do so, placed 99 Wall into great financial stress.[71] Due to 99 Wall's dire financial situation due to Allied World's delay and eventual failure to pay for the soft costs that 99 Wall needed to pay out of its own pocket, 99 Wall was forced to offer significant concessions to these purchasers as it couldn't afford to wait to find new buyers.[72]

For some purchasers, the concessions were not enough. A number of purchasers backed out of their initial purchase contracts.[73] In urgent need of cash flow, 99 Wall was forced to sell

---

[65] *Id.* at ¶ 9.
[66] *Id.* at ¶ 3.
[67] *Id.* at ¶ 4.
[68] *Id.* at ¶ 9.
[69] *Id.* at ¶ 90.
[70] *Id.* at ¶ 89.
[71] *Id.* at ¶ 87-88.
[72] *Id.* at ¶ 91-92.
[73] *Id.* at ¶ 91.

these units at substantially lower prices to new buyers than previously agreed to.[74] With respect to the units that were not yet sold, 99 Wall significantly lowered the amounts that it was willing to accept for the units.[75] 99 Wall sold remaining units at a significant discount in order to assuage the dire financial position Allied World's refusal to pay covered costs had put it in.[76] 99 Wall, had it been paid fully by Allied World, would have been in a better position to wait for buyers who would have paid a higher price.[77]

The reality remains that, if not for Allied World's delay, change in position, misrepresentations, and failure to pay 99 Wall's delay claim, 99 Wall would not have been forced to make such substantial concessions in the sales of its units. Had Allied World promptly paid 99 Wall's delay claim, or at least an undisputed amount of it, 99 Wall would have had the necessary financial support to maintain its loan obligations. However, Allied World chose to hide and then reject the initial delay finding of Mr. DePhillips and did everything in its power to delay the claim and reduce its liability. Allied World was well aware of these potential damages, not only because 99 Wall repeatedly stressed the importance of urgency and their dire financial situation, but also because of the well-known realities of commercial development and the overall intent of builder's risk policies. As a significant player in the construction insurance industry, Allied World's contention that 99 Wall's damages were completely unforeseeable to it is impossible to believe.

Beyond the fact that timely project completion and liquidation of units is a concept well-known to insurers and parties involved in commercial construction and development, Allied World was aware of specific facts in this instance which made 99 Wall's damages foreseeable. Allied World's vice president, Paul Aviles, testified that he was aware of the phased completion schedule

---

[74] *Id.* at ¶ 90.
[75] *Id.* at ¶ 93.
[76] *Id.* at ¶ 93.
[77] *Id.* at ¶ 94.

of the Project, and similarly that such a schedule is relevant to, and could impact, the delay analysis

under the Policy.

> Q:      Is that relevant to the adjustment of losses when it comes to delay?
> A:      Is "that," "that" meaning phased completion?
> Q:      Yes.
>         Mr. Gonzalez: Objection.
> A:      And again, I said before it can be.
> Q:      Okay. Why?
> A:      Because of the damages are involved in a certain part of the building that
>         was to complete at a different time than another time [as stated], wouldn't
>         that impact the delay analysis? It seems like it would.[78]

This undoubtedly factored into why Mr. Aviles instructed Mr. DePhillips to analyze the

loss based on phased completion.[79]

And similarly, Ms. Enloe drafted literature endorsing the idea that a project with multiple

phases requires a different delay analysis approach:

> Q:      This is the article that you wrote with Mr. Held. I don't remember
>         the date right now.
> A:      Right.
> Q:      Again, this is the report where you talk about measuring Builder's
>         Risk insurance policy claims, right?
> A:      Yes.
> Q:      And measuring the loss for those claims?
> A:      Yes.
> Q:      In that article, you seem to endorse the idea that you do look at TCOs
>         that might be at issue in a particular—you know, if there are separate
>         TCOs that are going to be issued in the project, that is a
>         consideration in a Builder's Risk loss, right?
> A:      Yes, if it has more than one TCO in the policy.[80]

Indeed, New York courts have recognized that consequential damages are appropriate for

an insurer's wrongful denial in the context of a builder's risk claim. In *Whiteface Real Estate Dev.*

*& Constr., LLC v. Selective Ins. Co. of Am.*, No. 08–cv–24, 2010 WL 2521794, at *5 (N.D.N.Y.

June 16, 2010), for example, a developer sought consequential damages for interest which was

---

[78] P. Aviles Tr. p. 100:3 – 14.
[79] 99 Wall Rule 56.1 Statement at ¶ 64
[80] L. Enloe Tr. p. 187: 18-25; p. 188: 1-12.

paid on a loan to cover reconstruction costs, as well as attorneys' fees and other related costs. Selective, the builder's risk insurer, moved for summary judgment arguing on the issue. *Id*. at 2. The Court held that "a reasonable fact finder could conclude that the consequential damages sought by [the developer] were reasonably contemplated by the parties and are necessary to return [the developer] to where it would have been had coverage been provided." *Id.* at 5. Similarly, in *Quick Response Commercial Div. v. Cincinnati Ins. Co.*, 2015 WL 5306093, at *1 (N.D.N.Y. Sept. 10, 2015), the insured developer sought consequential damages against Cincinnati for additional costs incurred as a result of Cincinatti's denial, including interest and attorneys' fees on unpaid invoices for work done to "preserve, protect and secure the property." *Id.* at 1. The Court denied Cincinnati's motion for summary judgment, holding that "it could not be said as a matter of law that Cincinnati did not foresee and contemplate the consequential damages sought by [the insured developer]." *Id.* at 5; *See also Acquista v. New York Life Ins. Co.,* 285 A.D.2d 73, 79, 730 N.Y.S.2d 272, 276 (2001) ("Among other things, this concept of damages presumes that a plaintiff has access to an alternative source of funds from which to pay that which the insurer refuses to pay. This is frequently an inaccurate assumption. Additionally, an insured's inability to pay that which the insurer should be covering may result in further damages to the insured.").

The factual circumstances surrounding 99 Wall's claim, as well as New York case law, make it impossible for Allied World to establish the absence of any genuine dispute of material fact regarding whether or not 99 Wall's damages were foreseeable. Allied World's claim that damages suffered as a result of its failure to pay for a delay claim run directly contrary to common knowledge amongst the construction and insurance industries and the intent of builder's risk delay coverage. The clear inference of the evidence, which must be made in 99 Wall's favor, is that 99

Wall was placed into financial stress by Allied World's bad faith, Allied World knew of 99 Wall's

financial stress and continued to act in a bad faith manner,

### c. There is a Genuine Issue of Material Fact as to Whether or Not 99 Wall Can Sustain a Claim for Attorneys' Fees and Costs

Allied World argues that 99 Wall is not entitled to attorneys' fees and costs unless it can

make a "showing of such bad faith in denying coverage that no reasonable carrier would, under

the given facts, be expected to assert it."[81] First, for the reasons described previously in this

memorandum, there is evidence that Allied World did act in such an egregious manner such that

no other reasonable insurer would. Such evidence satisfies the test articulated in *Sukup*, which

Allied World recognizes as validly entitling an insured to attorneys' fees and costs.[82] In its

argument, Allied World does not rely upon factual evidence to make a showing that it is entitled

to summary judgment, but rather simply relies upon this Court's dicta in the context of the

previously decided Motion to Dismiss. On Summary Judgment, the burden is on the movant to

conclusively establish that there are no genuine issues of material fact. In fact, the evidence

adduced during the discovery period suggests more than "an arguable difference of opinion

between carrier and insured over coverage," but rather a concerted attempt by Allied World to

limit its liability for covered claims and avoid a costly payment to 99 Wall at all costs. *Sukup,* 19

N.Y.2d at 522. Making all inferences in favor of the non-moving party, it is clear that there is an

issue of material fact as to whether or not Allied World acted in bad faith. As such, this issue must

move forward and be decided by a jury.

### V.    CONCLUSION

---

[81] Allied World's Memorandum of Law in Support of Its Motion for Partial summary Judgment Regarding 99 Wall's Pleas for Consequential Damages and Attorneys' Fees, p. 21-2 *citing Sukup*, 19 N.Y.2d at 522.

[82] In citing to *Sukup* as the basis of its argument in this section, Allied World implicitly concedes that this higher standard applies to attorneys' fees and costs, not consequential damages under *Bi-Economy.*

Allied World cannot carry its burden to establish that there are no genuine issues of material fact as to its bad faith conduct, and by extension, 99 Wall's ability to obtain consequential damages and attorneys' fees. As such, 99 Wall respectfully requests that this Court deny 99 Wall's Motion to Partial Summary Judgment Regarding 99 Walls' Pleas for Consequential Damages and Attorneys' Fees.

Respectfully submitted

SAXE DOERNBERGER & VITA, P.C.

/s/Philip Brown-Wilusz

Tracy Alan Saxe, Esq.
Bar No. TS7211
Philip Brown-Wilusz
Bar No. PB5490
35 Nutmeg Drive, Suite 140
Trumbull, Connecticut 06611
Telephone:     203-287-2100
Fax:               203-287-8847
Email:           tas@sdvlaw.com
                     pbw@sdvlaw.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 2nd day of November 2020, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/Philip Brown-Wilusz

Philip Brown-Wilusz, Esq.

Bar No. PB5490

Saxe Doernberger & Vita, P.C.

35 Nutmeg Drive, Suite 140

Trumbull, Connecticut 06611

Telephone:    203-287-2100

Fax:              203-287-8847

Email:          pbw@sdvlaw.com

26