UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 09/29/2021

---

99 WALL DEVELOPMENT, INC.

                          Plaintiff,

          v.

ALLIED WORLD SPECIALITY
INSURANCE COMPANY,

                          Defendant.

---

18-CV-126 (RA)


OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff 99 Wall Development Inc. ("99 Wall"), the owner of a Manhattan development, filed this breach-of-contract action against its builders' risk insurer, Defendant Allied World Specialty Insurance Company ("Allied World"). 99 Wall seeks damages under its insurance policy for losses sustained in connection with two separate incidents involving water damage to its 29-story residential building, in July and October 2016. Although Allied World has made payments for losses covered under the insurance policy—including the costs of repairing the water damage itself—99 Wall contends that Allied World was required to, but did not, compensate it for costs associated with delays to the project. 99 Wall further charges that Allied World acted in bad faith in investigating and adjusting 99 Wall's claim, such that Allied World is now liable for attorneys' fees and other consequential damages caused by its failure to reimburse the costs of the delay.

Before the Court are two partial summary judgment motions filed by Allied World, seeking (1) a ruling that the insurance policy mandates the use of particular methodologies for measuring delays to the project, Dkt. 199; and (2) to dismiss 99 Wall's pleas for consequential damages and attorneys' fees based on allegations of bad faith, Dkt. 197. Allied World has also

filed a motion to strike certain documents relied on by 99 Wall in its summary judgment

opposition papers. Dkt. 221. For the following reasons, Allied World's motion for summary

judgment on methodology is denied in part and granted in part, its motion for summary judgment

on the issue of bad faith is granted, and its motion to strike is denied.

## BACKGROUND

### I.       Factual Background

The following facts are drawn from the parties' Local Civil Rule 56.1 statements and are

undisputed unless otherwise noted.

Plaintiff 99 Wall owns a 29-story building at 99-101 Wall Street in Manhattan. *See* 99

Wall's Corrected Responses to Allied World's 56.1 Statement, Dkt. 232-2 ("Pl. Bad Faith

56.1"), ¶ 1. In connection with the renovation and conversion of that building into residential

condominiums, Defendant Allied World issued 99 Wall a builder's risk insurance policy ("the

Policy"). *Id*. Construction began in May 2015. *See* Allied World's Response to 99 Wall's 56.1

Statement, Dkt. 226 ("Def. Methodology 56.1 Reply"), ¶ 45. In July and October 2016, two

"water events" caused damage to the project. Pl. Bad Faith 56.1 ¶ 3. "The first incident involved

rain water leaking through the roof of the building and causing damage to the building's

elevators. The second incident involved a leak from a water tank on the 25th floor of the building,

causing extensive damage to various condominium units and common areas." Dkt. 134 at 1. In

response to the water events, 99 Wall submitted claims to Allied World for both the physical

damage caused by the water events, as well as costs stemming from delays to the completion of

the project. Pl. Bad Faith 56.1 ¶ 4. Allied World made a series of payments totaling over $2

million to 99 Wall to cover the physical damage caused by the water leaks. *Id*. ¶ 11-14. This

litigation centers around the parties' disputes regarding to what extent the project was delayed by

the water events, the methodology by which the delays ought to be measured, and Allied

World's handling of 99 Wall's pursuit of reimbursement for delay costs.

### A.  The Insurance Policy

The Court begins by reviewing the key terms of the insurance policy that are relevant to

the instant dispute. The insurance policy purchased by 99 Wall provides builder's risk and delay-

in-completion coverage for the project described in the policy as "Rehab to an existing 29 story,

98,000 SF fire resistant building, to convert office into residential apartments." *See* Dkt. 203-1 at

2 ("the Policy"). The Policy is comprised of a series of documents, including a primary Builder's

Risk Coverage – Comprehensive Form (the "Builder's Risk Form"), and a series of

endorsements that add to or clarify what is covered under the main policy.

Under the Builder's Risk Form, Allied World "cover[s] direct physical loss or damages

caused by a covered peril to 'buildings or structures' while in the course of construction,

erection, or fabrication." Policy at 65. It is undisputed that the water events are a "covered peril"

under the policy. *See* Allied World's Memorandum of Law in Support of its Motion for Partial

Summary Judgment Regarding Methodology, Dkt. 200 ("Def. Methodology Mem.") at 1. The

Builder's Risk Form also states in a section entitled "PROPERTY NOT COVERED" that it does

not cover "any standing 'building or structure' in the process of rehabilitation or renovation."

Policy at 66. Because the main Builder's Risk Form does not cover rehabilitation and renovation

projects, 99 Wall purchased a separate Rehabilitation and Renovation Endorsement. *See* 99

Wall's Amended Memorandum of Law in Opposition to Partial Summary Judgment Regarding

Methodology, Dkt. 232-24 ("Pl. Methodology Mem.") at 4.

The "Rehabilitation and Renovation Endorsement" provides as follows: "The [Builder's

Risk Form] is amended as follows: . . . the exclusion for Standing Building or Structure found in

the PROPERTY NOT COVERED section is deleted in its entirety and replaced by the following:

**Standing Building Or Structure –** Except for a covered 'existing building,' 'we' do not cover any:

1. Standing building or standing structure; or

2. Part of a standing building or standing structure

that has been wholly or partially constructed, erected, or fabricated prior to the inception of this policy.

*See* Policy at 60; *see also* 99 Wall's Corrected Responses to Allied World's Rule 56.1 Statement, Dkt. 232-26 ("Pl. Methodology 56.1") ¶ 10. The Rehabilitation and Renovation Endorsement also provides that Allied World covers "direct physical loss or damage caused by a covered peril to 'building materials' and 'existing buildings' that are part of your 'rehabilitation or renovation project.'" Policy at 60. The endorsement defines "Rehabilitation or renovation project" to mean "a project involving the construction, rehabilitation, or renovation of a structure or building." *Id*.

The Builder's Risk Form also excludes "loss or damage caused directly or indirectly by a . . . delay in the completion of construction." Policy at 77; Pl. Methodology 56.1 ¶ 9. To get around this exclusion, 99 Wall purchased delay-in-completion coverage, which is reflected in a separate endorsement. *See* Policy at 44.

The delay in completion endorsement provides, in relevant part, as follows:

- "If this coverage part is attached to the Rehabilitation And Renovation Form, the references to 'building or structure' are replaced with 'rehabilitation or renovation project.'"

- "'Delay' means an interruption in the construction, erection, or fabrication of a '[rehabilitation or renovation project]' caused by a covered peril. . . . 'Delay' does not mean an interruption in or extension of construction, erection, or fabrication caused by or resulting from a change order, design change, or other action or decision that is independent of direct physical loss or damage caused by a covered peril for which payment is made under the Builders' Risk Coverage form to which this coverage part is endorsed, whether occurring prior to or after such physical loss or damage."

- "'Delay period' means the period of time the completion of the construction, erection, or fabrication of a covered '[rehabilitation or renovation project]' is

'delayed' as a result of direct physical loss or damage caused by a covered peril to property covered under the Builders' Risk Coverage form to which this coverage part is attached."

- "'Delay period' does not mean the increased time . . . caused by or resulting from a change order, design change, or other action or decision that is independent of direct physical loss or damage caused by a covered peril for which payment is made under the Builders' Risk Coverage form to which this coverage part is endorsed, whether occurring prior to or after such physical loss or damage."

*Id.*; *see also* Pl. Methodology 56.1 ¶¶ 14-17.

### B. 99 Wall's Construction Schedule

To complete the construction project, 99 Wall entered into a contract with T.G. Nickel & Associates LLC ("T.G. Nickel") on February 24, 2015. Def. Methodology 56.1 Reply ¶ 36. Plaintiff asserts that from the inception of the project, "the focus was on completing individual units, as selling individual units was the sole source of funds for 99 Wall." *Id.* ¶ 37. Allied World notes, however, that the contract between 99 Wall and T.G. Nickel initially had a baseline construction schedule containing a single substantial completion date for the entire project: June 15, 2016. *Id.* ¶ 46; *see also* Pl. Methodology 56.1 ¶ 2; Beach Dep. 56-58; Dkt. 203-5 at 9. At some point during construction in mid-2016, after experiencing slowdowns relating to delayed erection of a hoist to allow access to upper floors of the building, 99 Wall and T.G. Nickel agreed to separate out the construction into two sections: TCO 1 (representing floors six through sixteen) and TCO 2 (for everything else). Def. Methodology 56.1 Reply ¶ 48; Pl. Methodology 56.1 ¶ 3-4.[1] Allied World asserts that these changes were agreed to solely between 99 Wall and its contractor while construction was underway. Def. Methodology 56.1 ¶ 5. 99 Wall maintains that Allied World was "informed of the . . . construction plan, including the focus on achieving TCO for the floors 6-16 from the very start of the first loss," Pl. Methodology 56.1 ¶ 5, but the

---

[1] "TCO" refers to a "temporary certificate of occupancy."

5

parties appear to agree that a phased construction plan was not contemplated at the time the insurance policy was issued.

By the time of the first water event, in July 2016, a significant number of the units in floors 6 through 16 were close to completion. *See* Allied World's Response to Plaintiff's Rule 56.1 Counterstatement, Dkt. 232-23 ("Def. Bad Faith 56.1 Reply"), ¶ 60. But the second water event in October 2016 caused extensive damage to many nearly completed units, necessitating extensive repairs to apartments that were nearly ready to be occupied. *Id*. ¶¶ 65-66. Whereas 99 Wall asserts that the project was delayed by 263 days, Allied World found there to be no covered delay to the project. *Id*. ¶ 66.

### C.  99 Wall's Claims and Allied World's Response

Following the two water events in July and October 2016, 99 Wall submitted claims to Allied World. The claims had two components—costs to repair direct physical damage and costs related to delay in completion. *See* Pl. Bad Faith 56.1 ¶¶ 3-4. The parties retained consultants to adjust the losses, arranged for an inspection of the project, and began collecting loss-related documentation. *Id*. ¶¶ 5-7. Less than a month after the first loss, Allied World sought documentation from 99 Wall about the losses and the construction schedule. *Id*. ¶ 8. 99 Wall's public adjuster gave deposition testimony that Allied World's documentation requests were "typical," not unnecessary, and similar to requests he had received on other claims he had handled. *Id*. ¶ 10; *see also* Panico Dep. 37-38. Other testimony stated that Allied World's requests were duplicative. *See* Picone Dep. 127.

Allied World initially made payments for the costs of repairing the physical damage from the water events. By February 2017, four months after the second water event, Allied World had made payments totaling $2,396,000. Pl. Bad Faith 56.1 ¶ 11–14. But it did not pay for the delay costs, despite the repeated urging of 99 Wall that it needed those funds promptly. *Id*. ¶ 69.

The parties engaged in settlement discussions beginning in late 2016 or early 2017. Allied World brought in the firm of J.S. Held to analyze the schedule to determine if there was a delay, and instructed Doug DePhillips to prepare a report to assess delay "on the basis of a phased completion." Pl. Bad Faith 56.1 ¶¶ 72, 88. As DePhillips saw his task, it was to help the parties analyze the delay and "see if we could get to a negotiated settlement." DePhillips Dep. 137. *See also* Aviles Dep. 15 ("We had our experts try to go out and see if they could come up with a delay period so that we could negotiate in the meeting. . . . They came up with some estimates of times. I don't know necessarily that they were considered delay under the terms of the policy."). In a meeting in late 2016, DePhillips stated that he was comfortable with a finding of a delay of 90 days attributable to the second water event. Pl. Bad Faith 56.1 ¶ 77. An internal January 2017 report DePhillips prepared in connection with the settlement discussions found delays to the project of 105 days stemming from the second water event; this report and its conclusions were not shared with 99 Wall. *Id*. ¶¶ 90–91, 96, 102. According to Allied World, this report by DePhillips was preliminary and based only on what limited information was available at the time, Def. Bad Faith 56.1 Reply ¶¶ 90-91, a contention 99 Wall disputes, *id*.; Roskop Dep 92. Because Allied World has taken the view that a delay period under the policy can be measured only with respect to delays to the project as a whole—and because the construction on the overall project was not completed until 2018—it asserts that the DePhillips report was "prepared at a time that a complete delay analysis, consistent with the Policy requirements, could not yet be completed." Def. Bad Faith 56.1 Reply ¶¶ 90-91. *See also* DePhillips Dep. 137. Following an unsuccessful settlement meeting in March 2017, Allied World paid an additional $600,000 to 99 Wall, "which while stated to be on an unallocated basis, appears to have been related to what Allied World considered to be the undisputed portion of the delay claim." Pl. Bad Faith 56.1 ¶ 99.

At that point, settlement talks between the parties broke down. *Id*. ¶ 33. In April 2017, an adjuster for Allied World sent 99 Wall a letter explaining that "we seem to be at an impasse in reaching an agreement on several aspects of the claim," and in particular that more information was needed to "fully assess the amount of time that it is claimed that the Project was delayed by the water damage incident." Dkt. 204-13. Allied World stated that it would need to determine the "delay period" as defined by the policy itself, and cited the relevant portions of the delay endorsement. *Id*. Allied World suggested that an appraisal would be the most expedient way to resolve the impasse, but 99 Wall did not respond to the request for an appraisal. Pl. Bad Faith 56.1 ¶¶ 38-39.

As the parties prepared for litigation, Allied World replaced DePhillips with Lisa Enloe, another expert consultant at J.S. Held. Pl. Bad Faith 56.1 ¶ 105. Joseph Roskop, Allied World's adjuster, stated that they believed "having another set of eyes would benefit us." *Id*.; *see* Roskop Dep. 53. DePhillips testified that his role was "completely different" from Enloe's: whereas DePhillips was instructed to "see if we could get to a negotiated settlement," Enloe's task was to "look at the two loss events in the context of the overall schedule of the project and whatever parameters of the builder's risk policy that she was dictated to." DePhillips Dep. 137. Those parameters included an instruction from Allied World that she analyze the delays "based on one total completion date, rather than based on a phased completion," and to use a "but for" methodology for measuring delay. Pl. Bad Faith 56.1 ¶¶ 113, 121. Similar to DePhillips, Enloe testified that their reports were necessarily different: "[DePhillips] did not do a full and complete analysis because the [construction] job at the time he wrote this report was not complete." Enloe Dep. 289. Enloe, who was paid $600,000 for her services, is "known in the insurance community to produce opinions that result in a finding of no coverage." Pl. Bad Faith 56.1 ¶¶ 106-107.

## II.    Procedural History

99 Wall filed suit in January 2018, raising a claim for breach of contract and the breach of the covenant of good faith and fair dealing. Dkt. 1. The operative amended complaint was filed in March 2018. *See* Dkt. 28. Allied World moved to dismiss 99 Wall's claims for consequential damages, attorneys' fees, and punitive damages. Dkt. 32. The Court held a hearing on January 17, 2019, at which the motion was denied by oral ruling. Dkt. 102. In September 2020, following discovery, Defendant filed the two partial summary judgment motions that are now before the Court.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 56 authorizes a court to grant summary judgment if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).[2] A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To survive summary judgment, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," and "may not rely on conclusory allegations or unsubstantiated speculation." *Bermudez v. City of New York*, 790 F.3d 368, 374 (2d Cir. 2015).

The moving party has the initial burden of demonstrating that no genuine issue of material fact exists. *See Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). If it satisfies this burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "However, when the burden of proof at trial

---

[2] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013). In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).

"Insurance policies are, in essence, creatures of contract, and, accordingly, subject to principles of contract interpretation." *Starr Indem. & Liab. Co. v. Excelsior Ins. Co.*, 516 F. Supp. 3d 337, 345 (S.D.N.Y. 2021). In *Starr*, Judge Failla summarized the law governing the interpretation of contracts at the summary judgment stage as follows:

> Where contractual language is ambiguous and subject to varying reasonable interpretations, intent becomes an issue of fact and summary judgment is inappropriate. Only where the language is unambiguous may the district court construe it as a matter of law and grant summary judgment accordingly. . . . If a contract term is susceptible to at least two reasonable interpretations, summary judgment is inappropriate because the meaning of an ambiguous contract term is generally an issue of fact, requiring the trier of fact to determine the parties' intent. . . . In contrast, if the contractual terms are unambiguous, the dispute is properly resolved on summary judgment, and the court must give effect to the intent of the parties as expressed in the clear language of the contract.

*Id* (citations omitted). *See also U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 875 F.2d 1044, 1048 (2d Cir. 1989) ("Under New York law, . . . the meaning of a contract is a question of law only if the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning.").[3]

---

[3] The parties do not draw the Court's attention to any choice of law provision in the insurance policy, and their briefs all appear to assume that New York law applies to this action, which is a sufficient basis for the Court to apply it. *See Arch Ins. v. Precision Stone*, 584 F.3d 33, 39 (2d Cir. 2009); *Columbus McKinnon Corp. v. Travelers Indem. Co.*, 367 F. Supp. 123, 141 n.10 (S.D.N.Y. 2018).

**DISCUSSION**

I.    **Allied World's Motion for Summary Judgment Regarding Methodology and Schedule for Measuring Delay**

The Court begins by discussing Allied World's motion seeking the Court's determination that its preferred methods for measuring delays to the 99 Wall project are the ones dictated by the insurance policy. As counsel for Allied World stated at oral argument, this motion asks the Court to "resolve two legal questions concerning how to interpret the policy's delay . . . coverage. Those questions are, what is the correct method for calculating 99 Wall's delay claim according to the policy's terms and conditions? And does the policy require that the parties calculate the delay to the entire project," or can 99 Wall claim losses based on delays to interim construction milestones? *See* Transcript of Oral Argument, Dkt. 250 ("Tr."), at 4. In assessing these questions, the Court interprets the parties' insurance policy using the same principles of construction it would use in interpreting an ordinary business contract. *Porco v. Lexington Ins. Co.*, 679 F. Supp. 2d 432, 435 (S.D.N.Y. 2009).

As Allied World has made clear, it is not, at this stage in the litigation, seeking to establish whether or to what extent the project was actually delayed; it is instead asking the Court to find as a matter of law that its preferred approaches to measuring delays are the ones mandated by the language of the Policy. *See* Tr. at 4. The Court will address each of the two legal questions raised by the motion in turn, concluding that although 99 Wall is correct that the policy does not mandate use of Allied World's "but for" method of measuring delay, Allied World is correct that a delay period must be counted by asking how long the project was delayed *on the whole*.

### A.  The Policy Does Not Necessarily Require a "But For" Methodology for Measuring Delay

As noted above, Allied World and 99 Wall each proffer a different method for measuring the delay caused by the water events, and each retained an expert who used that method. Allied World characterizes its method as employing a "but for" analysis, which asks "whether the project would have [been] completed any earlier had a [covered] loss event not occurred." Def. Methodology 56.1 ¶¶ 23-24. This was the method employed by Allied World's expert, Lisa Enloe, in determining that the project was not delayed at all, because any delays to the project were simultaneously caused by other concurrent problems that were not covered by the insurance policy. *See* Def. Methodology 56.1 Reply ¶ 118; Def. Methodology 56.1 ¶ 23. But for the occurrence of the covered water events, Allied World insists, the project would still have been delayed by other issues, such that Allied World is not responsible for the costs of delays caused by non-covered events. 99 Wall, by contrast, argues that the proper way to measure delay to the project is known as the "critical path method," which its expert, James Beach, employed. *See* Pl. Methodology Mem. at 1. 99 Wall characterizes this method as involving "analyz[ing] what events actually impacted the completion, . . . break[ing] [them] apart . . . and . . . subtract[ing] out any events that were not covered." Tr. at 20. Applying that method, 99 Wall's expert calculated a delay period of 263 days. *See* Pl. Methodology 56.1 ¶ 55.

At the outset, the Court disagrees with 99 Wall's assertion that Allied World's motion is really "a *Daubert* motion under the guise of a motion for summary judgment," Dkt. 230 at 1, or that resolving this question would necessarily require a "battle of the experts" that is not appropriately waged at summary judgment. *See Diamond v. Sokol*, 468 F. Supp. 2d 626, 636 n.9 (S.D.N.Y. 2006) (Lynch, J.) ("The qualifications and opinions of dueling experts are issues for trial; defendant cannot win summary judgment on the strength of a contested expert opinion.").

Allied World is asking the Court to interpret a contract, i.e., to assess whether the insurance policy itself requires a particular method for measuring delay. The Court accordingly does not ascribe great relevance, on this motion, to the parties' arguments and evidence about which method for measuring delay is the most reliable, the most appropriate under the circumstances, or the most favored by courts.[4] The answer to the question now before the Court must be found in the language of the parties' contract. *See* Enloe Dep. 60 ("In my experience there's generally language in the policy that talks about how to measure delay.").

The Court agrees with 99 Wall, however, that this particular insurance policy does not mandate the use of Allied World's "but for" method for measuring delay. Allied World concedes that the policy does not expressly require use of its "but for" analysis. It instead argues that the policy's wording "*implicitly* uses a 'but for' analysis to measure whether a loss causes a delay." Def. Methodology Mem. at 1 (emphasis added). Its argument relies primarily on the following excerpts of the policy language:

- The delay-in-completion endorsement defines "delay" as an interruption to the project "**caused by** a covered peril," such as water damage. In addition, "'Delay' does not mean an interruption in or extension of construction, erection, or fabrication caused by or resulting from . . . [an] action or decision that is **independent of** direct physical loss or damage caused by a covered peril."

---

[4] For this reason, Allied World's motion to strike the affidavits of Robert D'Onofrio, George Fink, and Charles Boland—each of which offers "expert opinions on the construction industries' preferred methods for measuring project delay," Dkt. 222 at 3—is denied as moot, given that their conclusions have not affected the Court's opinion. *See Escoffier v. City of New York*, No. 13-CV-3918 (JPO), 2019 WL 4747666, at *3, n.3 (S.D.N.Y. Sept. 30, 2019) (denying as moot motion to strike an affidavit where the court did not rely on the challenged affidavit). For similar reasons, the Court has also not relied on the Beach Affidavit's assertions regarding whether the Policy dictates a particular method for measuring delay, and the motion to strike that affidavit is similarly denied as moot.

Allied World's motion to strike is otherwise denied. The mere fact that the Lari and Picone affidavits are alleged to be self-serving does not, in the Court's view, mandate striking them from the record altogether. The Court is fully capable of discounting self-serving or inadmissible statements without striking them. *See Ferraresso v. Town of Granby*, 646 F. Supp. 2d 296, 301 (D. Conn. 2009) ("The court knows the difference between admissible and non-admissible evidence, and would not base a summary judgment decision simply upon the self-serving *ipse dixit* of a particular party.").

- The endorsement further defines a "delay period" as a period where "the completion of" a covered project is "delayed **as a result of** direct physical loss or damage caused by a covered peril."

- Moreover, under the terms of the policy, "delay period" specifically "does not mean" the time added to a project that is "caused by or resulting from a change order, design change, or other action or decision that is **independent of** direct physical loss or damage caused by a covered peril."

- Finally, the policy provides that Allied World does not cover "any additional expenses . . . due to any increase in the 'delay period' caused directly or indirectly by . . . additional time that would be required to replace or repair any part of a covered 'rehabilitation or renovation project' due to . . . any . . . action or decision which results in a 'delay' in the completion of the covered project and is **independent of** direct physical loss or damage caused by a covered peril . . . , whether occurring prior to or after such physical loss or damage."

Def. Methodology Mem. at 7-9 (emphasis added); *see also* Policy at 44, 49–50.

Allied World uses a simplified hypothetical to illustrate how it views the operation of these provisions:

> Event 1, which is covered by the Policy, causes a 100-day delay to the completion of a project. Event 2, which is not covered, concurrently causes a 99-day delay to the completion of the project. Under [99 Wall's] analysis, the loss related "delay period" is 100 days, despite the fact that there was a concurrent 99-day delay from non-loss related causes. [99 Wall's] analysis discounts the fact that in the absence of Event 1, the project would nevertheless have been delayed 99 days. Under this scenario, in accordance with the Policy wording, the loss related delay to the project is one day, not 100 days.

Def. Methodology Mem. at 24. Applied to the facts of this case, what Allied World is arguing is that when a period of delay is caused simultaneously by a covered peril like water damage (Event 1) and something else not covered (Event 2), that delay cannot count under the policy as having been "caused by" or "the result of" covered losses.

In the Court's view, this is one reasonable interpretation of the contractual language. But Allied World has not carried its burden of demonstrating that such a result is the only plausible reading of the language of the insurance policy.

14

For one thing, Allied World's interpretation would effectively require the Court to add additional terms to the contract, which it cannot do at this stage. *See Brust v. Mut. of Omaha Ins. Co.*, 724 N.Y.S.2d 254, 258 (N.Y. Sup. Ct. 2000) ("The Court cannot add terms to the insurance policies or construe language to rewrite the insurance contract."); *Starr Indem.*, 516 F. Supp. 3d at 345-346 (quoting *U.S. Naval Inst.*, 875 F.2d at 1048) ("If a contract term is 'susceptible to at least two reasonable interpretations,' summary judgment is inappropriate because the meaning of an ambiguous contract term is 'generally an issue of fact, requiring the trier of fact to determine the parties' intent.'"). Allied World interprets "caused by a covered peril" to mean, in effect, "caused *only* by a covered peril," and it interprets "delayed as a result of" a covered peril to mean, in effect, "delayed *only* as a result of" a covered peril. But the policy does not say those things.

Moreover, the fact that a delay under the contract cannot mean "increased time . . . caused by or resulting from [an] . . . action or decision that is *independent* of direct physical loss or damage caused by a covered peril" does not alter the Court's conclusion that the policy is ambiguous as to how to measure delay. The "independent" provision certainly makes clear that a period of delay caused *entirely* by something unrelated to a covered peril cannot, on its own, be counted toward a "delay period." But suppose, as in Allied World's example, that two overlapping and entirely simultaneous events—one covered and one not—cause a 99-day delay in construction. The Court does not find it unambiguously the case that, under those circumstances, every single one of those 99 days of delay can be considered "independent of

direct physical loss or damage caused by a covered peril." In such a case, the 99-day delay is arguably caused just as much by the covered peril as it is by the non-covered reason.[5]

In sum, Allied World has not demonstrated the absence of a genuine dispute of material fact as to the interpretation of these provisions, because when a delay is simultaneously attributable to *both* a covered peril and a non-covered event, the delay period could under one plausible reading of the policy be considered "a result of" a covered peril. The insurance policy does not clearly and unambiguously exclude all coverage for overlapping delays where only one of the sources of delay is a covered peril. Summary judgment on this issue is therefore inappropriate. *See Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426, 441 (S.D.N.Y. 2018), *aff'd*, 777 F. App'x 531 (2d Cir. 2019) ("Where contract terms or provisions are susceptible to at least two reasonable interpretations, and intent must be gleaned from disputed evidence or from inferences outside the written words, it becomes an issue of fact that must be resolved by trial.").

To be clear, by finding that Allied World's preferred methodology is not necessarily mandated by the "plain language" of the insurance policy, *Duane Reade, Inc. v. Cardtronics, LP*, 54 A.D.3d 137, 141 (1st Dep't 2008), the Court is neither endorsing 99 Wall's methodology nor suggesting that 99 Wall's expert more faithfully applied the contract. Rather, the Court is

---

[5] Allied World argues that to allow an insured to recover for a loss that is caused equally by a non-covered event as by a covered event—i.e., a loss that would have occurred even had the covered loss not taken place—would undermine the purposes of risk insurance. It maintains that "if the project's completion would have been delayed regardless of the Water Events, then allowing 99 Wall to recover costs associated with *any* delay is essentially allowing 99 Wall to profit from the loss." Def. Methodology Mem. at 22-23. This would "contravene the basic [tenets] of property insurance law" whereby the insured should be restored to the position he would have occupied absent the covered losses. *Id.*; *see also Sher v. Allstate Ins. Co.*, 947 F. Supp. 2d 370, 378 (S.D.N.Y. 2013) (quoting *McAnarney v. Newark Fire Ins. Co.*, 159 N.E. 902, 904 (N.Y. 1928)) ("The contract of the insurer is not that, if the property is burned, he will pay its market value, but that he will indemnify the assured, that is, save him harmless or put him in as good a condition, so far as practicable, as he would have been in if no fire had occurred."). The Court finds this argument appealing as a matter of common sense. But at this stage of the litigation, the Court's task is not to determine which reading of the policy is more consonant with general principles of insurance law—it is to determine whether the policy is "plain and unambiguous," *Zurich Am. Ins. Co. v. ABM Indus., Inc.*, 397 F.3d 158, 164 (2d Cir. 2005), which, in the Court's view, it is not.

suggesting only that the language of the insurance policy does not necessarily compel a "but for" methodology. *See Vetromile v. JPI Partners, LLC*, 706 F. Supp. 2d 442, 453 (S.D.N.Y. 2010) ("On a motion for summary judgment, it is not the Court's role to establish the most natural reading of the Contract."). It will be for a factfinder to ultimately determine which interpretation of the contract is the best one, particularly when considering the parties' dueling extrinsic evidence, such as what methodology is more commonly used in the industry. *See U.S. Naval Inst.*, 875 F.2d at 1048 (quoting 3A Corbin, *Corbin on Contracts* § 556, at 240–42 (1960)) ("Usages and customs may be proved . . . to aid in interpretation of the words of the parties."). But at this stage, the Court cannot conclude that there is "no reasonable basis for a difference of opinion," *Vetromile*, 706 F. Supp 2d at 448, about how to read the delay provisions.

## B.  There is No Basis Under the Contract for Measuring Delays to the Interim Construction Phases

Allied World next argues that the Policy requires the parties to "measure delay to the Project as a whole, rather than to some interim date." Def. Methodology Mem. at 25. On this point, the Court agrees and finds that the policy precludes measuring delay to interim construction deadlines that were not originally incorporated into the construction contract.

As noted above, the delay-in-completion coverage endorsement defines "delay period" as "the period of time the completion of the construction, erection, or fabrication of a covered 'building or structure' is 'delayed' as a result of direct physical loss or damage caused by a covered peril so property covered under the Builders' Risk Coverage form to which this coverage part is attached." *See* Policy at 44. But the delay endorsement also provides that "[i]f this coverage part is attached to the Rehabilitation And Renovation Form," which it is, "the references to 'building or structure' are replaced with 'rehabilitation or renovation project.'" *Id*.

17

Accordingly, a delay period means the extra time taken for "the completion of the construction . . . of a covered 'rehabilitation or renovation project.'" *Id.*

What is a rehabilitation or renovation project? The policy defines it as "a project involving the construction, rehabilitation, or renovation of a structure or building by you or your contractors or subcontractors." *Id.* at 60. But it also describes 99 Wall's particular "rehabilitation and renovation project" as follows:

> Description Of "Rehabilitation Or Renovation Project"
>
> Rehab to an existing 29 story, 98,000 SF fire resistive building, to convert offices into residential apartments, as outlined in submission on file. Includes some light structural work.

*Id.* at 58.

The parties construe these policy provisions differently. Allied World argues that, because the covered "project" is defined in the Policy as the rehabilitation of the entire 29-story building, there is no support in the Policy for the use of interim completion deadlines to measure delays. By contrast, 99 Wall contends that because a "rehabilitation and renovation project" can include work on a "structure," and because a "structure" can refer to a subset of the full building, the policy does contemplate the use of interim deadlines. In 99 Wall's telling, the units on floors 6 to 16 are covered "structures" such that a compensable delay period can be measured in terms of how those units were delayed by a covered peril, not just in terms of how the overall project was delayed. *See* Pl. Methodology Mem. at 23.

The Court agrees with Allied World, and finds the policy to be sufficiently clear so as to grant summary judgment on this issue. *See Vetromile*, 706 F. Supp. 2d at 447 ("The mere fact that the parties disagree on the proper interpretation of the contract does not render the contractual language ambiguous."). For one thing, 99 Wall's argument does not adequately grapple with the fact that the delay endorsement expressly replaced "building or structure" with

"rehabilitation or renovation project," which to the Court suggests that the drafters of the contract specifically intended for delays to be measured with respect to a whole "project" rather than merely a "building or structure." Moreover, although the policy states that a "rehabilitation or renovation project" is a project involving construction work on "a structure or building," that does not mean that every time a "structure or building" is being worked on, there is a distinct "rehabilitation or renovation project." Such a reading would produce absurd results—if 99 Wall is correct that a "structure" means any "part" of the whole building, Pl. Methodology Mem. at 23, then construction work on any single element of the overarching project could be characterized as a "rehabilitation or renovation project," and the insured and its contractor could unilaterally determine that completing that element is an important interim phase, such that delays to the completion of that single element could trigger delay coverage. But here, the only non-generic description of a rehabilitation or renovation project in the policy describes 99 Wall's project to renovate the whole 29-story building. Policy at 58. A different result might be warranted if 99 Wall's project was designed from the start to proceed in multiple phases. But in fact it was not until 2016, after construction was well under way and after the Policy was issued, that 99 Wall and its contractor revised their contract to include multiple TCO dates instead of a single completion date. Def Methodology 56.1 ¶¶ 3-4.

Under similar circumstances, courts have found that delays must be measured to the whole project. In *W2001Z/15 CPW Realty, LLC v. Lexington Ins. Co.*, No. 650593/2010, 2014 WL 264468 (N.Y. Sup. Ct. Jan. 22, 2014), as here, water caused damage to an apartment building. The insurer argued that to receive delay costs, the insured had to establish a "delay in the completion of the insured project *as a whole*," while the insured argued that the "delay-in-completion endorsement covers claims based upon a delay in the closing of individual units, requiring the use of separate dates for the scheduled date of completion of each unit, rather than

the insured project as a whole." *Id*. at *3. The policy in that case appears similar to the one here: it measured a delay period as beginning on the day "the INSURED PROJECT would have been completed," *id*. at *4, which resembles this policy's delay endorsement, in that it counts a delay period from "the completion of . . . a covered 'rehabilitation or renovation project.'" Policy at 44. The *15 CPW Realty* court held that the policy "require[d] plaintiff to establish that there was a delay in the completion of the insured project as a whole," as "nothing in the policies may be interpreted as tying the date of completion to a closing date on a particular unit, rather than the entire insured project." *Id*. at *5. *See also James F. Campenella Const. Co. v. Great Am. Ins. Co. of New York*, No. CIV.A. 10-681, 2010 WL 4812990, at *5 (E.D. Pa. Nov. 24, 2010) (reaching the same conclusion where the insurance policy covered delays to "the completion of the 'project'").

99 Wall points to Judge Fitzwater's opinion in *Hall Arts Ctr. Off., LLC v. Hanover Ins. Co.*, 327 F. Supp. 3d 979 (N.D. Tex. 2018), which held that an insured could recover the costs of delays to an interim construction milestone, as opposed to the project as a whole. But as Allied World observes, that case is distinguishable for two key reasons. *See* Def. Methodology Reply Mem. at 9-10. First, in that case the delay endorsement did not replace "building or structure" with "rehabilitation or renovation project" such that the definition of "delay period" was "the period of time the completion of the construction, erection, or fabrication of a covered 'building or structure' is 'delayed' as a result of direct physical loss or damage caused by a covered peril." *Hall Arts*, 327 F. Supp 3d at 988. As discussed above, the reference in 99 Wall's Policy to the entire "rehabilitation or renovation project" supports Allied World's argument that the delays must be measured to the project as a whole, and makes this case more similar to *15 CPW Realty* and *James F. Campenella*, *supra*. *See Hall Arts*, 327 F. Supp. 3d at 994 (distinguishing *15 CPW Realty* and *James F. Campenella* on the grounds that, unlike in those cases, Hall Arts's delay

coverage provision "[did] not explicitly define coverage with reference to the overall project."). Second, in *Hall Arts*, the initial contract between the insured and its construction contractor "set two progress milestones for the project," with a different target date for the completion of each. *Id*. at 987. Here, by contrast, the initial contract between 99 Wall and T.G. Nickel envisioned a single completion date for the entire project.

For these reasons, the Court finds that 99 Wall's position on this question has no support in the language of the policy. To the extent 99 Wall's project was in fact delayed as a result of the water damage—a question the Court is not asked to and will not answer today—that delay must be a delay to the completion of the entire project, and not to interim deadlines determined after the fact between 99 Wall and its contractor.

Allied World's partial motion for summary judgment regarding methodology is thus denied in part (with respect to the first question) and granted in part (with respect to the second question).

## II.    Allied World's Motion for Summary Judgment Regarding Consequential Damages and Attorneys' Fees

Allied World's other partial summary judgment motion seeks to cut off 99 Wall's pleas for consequential damages and attorneys' fees based on Allied World's alleged bad-faith handling of 99 Wall's claims. When Allied World moved to dismiss the claim that it breached the covenant of good faith and fair dealing, the Court denied the motion, calling 99 Wall's allegations of bad faith "just sufficient enough to sustain a claim for consequential damages." Dkt. 102 at 6. The Court further deferred ruling on attorneys' fees, but stated that it was "skeptical" that 99 Wall could make the requisite showing under New York law that Allied World acted with "such bad faith" that no reasonable insurer would assert its position. *Id*. at 8. Now, with the benefit of discovery and more fulsome briefing on the parties' respective

positions, the Court finds that Allied World has thus far denied delay costs based on what is at the very least a good faith, reasonable interpretation of the insurance policy, and did not otherwise engage in unreasonable conduct. Summary judgment is accordingly also granted to Allied World on 99 Wall's bad faith claim and its concomitant pursuit of consequential damages and attorneys' fees.

Under New York law, neither consequential damages nor attorneys' fees are available to an insured absent a showing of bad faith on the insurer's part. *See Panasia Ests., Inc. v. Hudson Ins. Co.*, 10 N.Y.3d 200, 203 (N.Y. 2008) ("Consequential damages resulting from a breach of the covenant of good faith and fair dealing may be asserted in an insurance contract context, so long as the damages were within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting."); *Sukup v. State*, 19 N.Y.2d 519, 522 (N.Y. 1967) (legal expenses may be recovered by an insured only upon "a showing of such bad faith in denying coverage that no reasonable carrier would, under the given facts, be expected to assert" that same position).

There is "a very strong presumption against bad faith liability" on the part of an insurer. *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 624 (2d Cir. 2001). That presumption "can be rebutted only by evidence establishing that the insurer's refusal" to provide coverage "was based on more than an arguable difference of opinion and exhibited a gross disregard for its policy obligations." *Id*. at 625. Indeed, such a claim depends on a showing of "egregious conduct" on the insurer's part. *Hastings Dev., LLC v. Evanston Ins. Co.*, 701 F. App'x 40, 45 (2d Cir. 2017). Only when an insurance company's interpretation of the policy is "unreasonable" can bad faith be found. *See Jane St. Holding, LLC v. Aspen Am. Ins. Co.*, No. 13 CIV. 2291 RWS, 2014 WL 28600, at *10 (S.D.N.Y. Jan. 2, 2014), *aff'd*, 581 F. App'x 49 (2d Cir. 2014) (granting summary judgment to insurer on insured's bad faith claim). *See also Liberty Surplus Ins. Corp.*

*v. Segal Co.*, 420 F.3d 65, 70 (2d Cir. 2005) (coverage dispute involved an "arguable difference of opinion" between insured and insurer, such that the insured could not recover attorneys' fees, even where the insurance policy "unambiguous[ly]" supported the insured's position).

Here, summary judgment is appropriate on 99 Wall's claim for consequential damages and legal expenses because Allied World has asserted what is "at best for [99 Wall] a good faith but mistaken interpretation of the [Policy]." *Scottsdale Ins. Co. v. McGrath*, --- F. Supp. 3d. ---, No. 19-CV-07477 (LJL), 2021 WL 3077578, at *7 (S.D.N.Y. July 19, 2021). As noted above, the Court finds that Allied World's interpretation of the delay endorsement—both its view of what methodology is required for measuring delay and its position regarding the schedule for measuring delay—to be plausible readings of the contractual language, even if they are not the only plausible readings. The parties' dispute thus does not involve "more than an arguable difference of opinion." *Hugo Boss*, 252 F.3d at 625.

99 Wall attempts to circumvent this conclusion by arguing that its claim for consequential damages "focus[es] not on whether or not there existed a legitimate coverage dispute, but rather whether or not Allied World performed its obligations under the contract in good faith." *See* 99 Wall's Amended Memorandum of Law in Opposition to Defendant's Partial Motion for Summary Judgment Regarding Consequential Damages, Dkt. 232-1 ("Pl. Bad Faith Mem."), at 11. *See also id*. ("The focus for the Court's review . . . is on the factual circumstances surrounding [Allied World's] investigation and continued adjustment of the claim, not on whether or not Allied World had a coverage dispute which justified its denial of coverage.").

In the Court's view, however, these questions are not so distinct. Much of the conduct that 99 Wall says amounts to bad faith was grounded in Allied World's interpretation of the insurance policy. For example, 99 Wall asserts that Allied World acted in bad faith when it instructed Enloe to use a "but for" method for measuring delay and to do so based on a single

completion date, rather than the phased completion approach that had been used by DePhillips.

*See* Pl. Bad Faith Mem. at 5. But these instructions were an extension of Allied World's

interpretation of what the policy required, which, as noted above, was at the very least

reasonable. Similarly, much is made by 99 Wall of Allied World's replacement of DePhillips

with Enloe after settlement talks broke down. But Allied World was entitled to retain an expert

in connection with this litigation that would support its interpretation of the insurance policy, so

long as that interpretation was a fair one. Although 99 Wall suggests that Allied World

improperly brought on Enloe in order to "benefit" itself, *id*., "an insurer who investigates

legitimate questions of insurance coverage is not acting in bad faith, and no insurer is required to

submerge its own interest in order that the insured's interests may be made paramount."

*Bernstein v. Geico Cas. Co.*, No. 19-CV-1899, 2020 WL 1308226, at *4 (E.D. Pa. Mar. 19,

2020). Contrary to 99 Wall's framing of the issue, these alleged incidents of bad-faith conduct

flow directly from the existence of a legitimate coverage dispute.

More broadly, assuming 99 Wall is correct that an insured can establish bad faith where

the insurer has asserted a reasonable position regarding the availability of coverage but has

otherwise engaged in egregious conduct, there would still be insufficient record evidence to

support an inference of bad faith. Even when viewed in the light most favorable to 99 Wall, the

record shows that Allied World promptly investigated 99 Wall's claims, made fairly typical (if

duplicative) requests for information, paid the costs of repairing the water damage, and engaged

in efforts to settle the delay claims. Allied World produced a report from its bad-faith expert,

Peter Evans, who found that Allied World "carried out a detailed and extensive investigation,"

"reasonably reached [its] conclusions," and took "actions [that] were consistent with industry

custom and practice." Pl. Bad Faith 56.1 ¶ 44. Evans concluded that "while there may be a bona

fide dispute as to the extent of loss and application of coverage, Allied World's conclusion was

reasonable." *Id*. 99 Wall did not file a rebuttal report to Mr. Evans's findings, and although it retained a damages expert of its own, that expert did not offer an opinion as to whether Allied World's handling of 99 Wall's claims violated its duty of good faith and fair dealing. *Id*. ¶¶ 42-43, 45. Viewed as a whole, the record does not support a finding that, even separate and apart from the merits of its interpretation of the contract, Allied World engaged in "egregious conduct." *Hastings Dev.*, 701 F. App'x at 45.

This result is consonant with the case law. *See Sunrise One, LLC v. Harleysville Ins. Co. of New York*, 293 F. Supp. 3d 317, 328 (E.D.N.Y. 2018) ("Although courts in this Circuit acknowledge that an insured can theoretically recover consequential damages from an insurer in a breach of contract action, they have generally found that the plaintiff was unable to meet the high standard to prevail on such a claim."). In *Jane St. Holding*, for example, Judge Sweet granted summary judgment to the defendant on the issue of bad faith where the parties had "a legitimate dispute as to the interpretation" of the insurance policy, where the insurance company "promptly conducted its investigation into the damage," and then paid out an undisputed portion of Plaintiff's claims. *See Jane St.*, 2014 WL 28600, at *11. Similarly, in *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.*, the insured charged that the insurer had acted in bad faith on the basis of "belated or even non-responses to [the insured's] inquiries, . . .repeated requests for documents which [the insured] contend[ed] it did not need because it had been previously provided the information," and significant delays in investigating the insured's claims. *See Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.*, 238 F. Supp. 3d 314, 331 (N.D.N.Y. 2017). Judge Hurd held that this evidence, taken together, did "not come close to satisfying the high standard for sustaining a bad faith claim," because the insurer "had legitimate grounds for investigating and not yet paying" the claim. *Id*. at 332. As in *Utica Mut. Ins.*, 99 Wall "cannot sustain its burden in opposition to summary judgment because it cannot show that [Allied World] had no

arguable basis to challenge its claim nor can it prove that no reasonable carrier would, under the given facts, challenge the claim." *Id*.

Accordingly, Allied World's motion for partial summary judgment regarding 99 Wall's pleas for consequential damages and attorneys' fees is granted.

## CONCLUSION

For the reasons discussed above, (1) Allied World's motion for partial summary judgment regarding methodology (Dkt. 199) is denied in part and granted in part; (2) Allied World's motion for partial summary judgment regarding consequential damages and attorneys' fees (Dkt. 197) is granted; and (3) Allied World's motion to strike (Dkt. 221) is denied.

No later than 30 days from the date of this order, the parties are directed to confer and file a joint status update concerning (1) proposed next steps in this litigation; (2) the prospects of settlement; and (3) whether the Court or Magistrate Judge Parker can be of assistance with settlement by way of either an additional settlement conference before Judge Parker or a referral to the District's mediation office.

The Clerk of Court is respectfully directed to terminate Dkts. 197, 199, and 221.

SO ORDERED.

Dated:     September 29, 2021
           New York, New York

_____
Ronnie Abrams
United States District Judge